# RECORD NO. 13-6290

In The

# United States Court Of Appeals
## For The Fourth Circuit

## JUSTIN WRIGHT MALLORY, SR.,

*Plaintiff – Appellant,*

v.

## TRAVIS HOLDORF; STAN SMITH; RANDY STRANGE,

*Defendants – Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AT COLUMBIA**

_____

## BRIEF OF APPELLANT
_____

**J. Edward Bell, III**
**BELL LEGAL GROUP**
**219 Ridge Street**
**Georgetown, SC  29440**
**(843) 546-2408**

*Counsel for Appellant*

**Jerry L. Finney**
**THE FINNEY LAW FIRM**
**2117 Park Street**
**Columbia, SC  29201**
**(803) 254-7408**

*Counsel for Appellant*

# TABLE OF CONTENTS

**PAGE:**

TABLE OF AUTHORITIES ...................................................................iv

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE...............................................................2

STATEMENT OF FACTS ....................................................................4

INTRODUCTION AND SUMMARY OF ARGUMENT .......................8

ARGUMENT .......................................................................................11

    STANDARDS OF REVIEW ...............................................................11

I.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR DEFENDANTS BECAUSE THE COURT ABUSED ITS DISCRETION IN REFUSING TO STAY THE CASE OR CONTINUE CONSIDERATION OF DEFENDANTS' SUMMARY JUDGMENT MOTION ....................................................................12

II.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANTS ON JUSTIN MALLORY'S FALSE-ARREST"/LACK OF PROBABLE CAUSE CLAIM ..................................15

    A.   Introduction .............................................................................15

    B.   The Summary Judgment Standards ...........................................16

    C.   The District Court misapplied the summary judgment standards.......................................................................................18

        1.   The District Court impermissibly resolved credibility questions, which "are exclusively reserved … for the jury"................................................18

2.    The District Court usurped the jury's function by "weigh[ing] the evidence" for "persua[siveness]" ........20

3.    The District Court weighed the "evidence" incorrectly and improperly gave Defendants every benefit of the doubt ........................................21

      (a)    The District Court was erroneously "persuaded" that Defendants' "timeline" showed Justin had "plenty of time" to kill Nekia ................................................24

      (b)    The District Court erroneously assumed there was any evidence—much less "trustworthy" evidence—to support "the conventional wisdom" that was murdered at 3:30 ................................................28

      (c)    The District Court erroneously assumed "Tribble's account" corroborated Defendants' timeline ............................34

      (d)    The District Court erroneously calculated that five minutes gave Justin "plenty of time" to argue with Nekia, kill her, clean up the murder scene, and beg neighbors for help before calling 911 ........................37

4.    The District Court erroneously rubberstamped Defendants assertion they had probable cause to arrest Justin because he lived in his own apartment .......40

5.    The District Court erroneously accepted Defendants' assertion they had probable cause to arrest Justin because he "lacked credibility" ................43

      (a)    There is a genuine question whether Justin "failed [his] polygraph examination" ................44

ii

(i)   Justin denied failing his polygraph exam and Defendants cited no "trustworthy information" that he did........45

(ii)   The District Court erred in crediting the polygraph results because the exam had been improperly designed and administered .......................................46

(b)   There is a genuine question whether having a extramarital affair renders the adulterer "incredible" *per se* .................................................51

(c)   There is a genuine question of whether Justin "lacked credibility" because he opined he had enjoyed a "'perfect' marriage while engaging in an affair" .................................56

III.   THE DISTRICT COURT ERRONEOUSLY GRANTED DEFENDANTS SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM THEY VIOLATED DUE PROCESS BY "FABRICATING" EVIDENCE ..................................59

CONCLUSION .......................................................................61

REQUEST FOR ORAL ARGUMENT ..................................................61

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

iii

## TABLE OF AUTHORITIES

**PAGE(S):**

### CASES:

*Aldridge v. Virginia,*
> 606 S.E.2d 539 (Va. App. 2004) ...................................................................27

*Anderson v. Liberty Lobby, Inc.,*
> 477 U.S. 242 (1986)........................................................................*passim*

*Atwater v. Lago Vista,*
> 532 U.S. 318 (2001)......................................................................24

*Baraka v. Kentucky,*
> 2004 Ky. App. LEXIS 51 (Ky. App. 2004)................................................27

*Beck v. Ohio,*
> 379 U.S. 89 (1964)........................................................................16, 23, 24

*Berghuis v. Thompkins,*
> 560 U.S. 370, 130 S. Ct. 2250 (2010) ............................................................18

*Best Med. Int'l, Inc. v. Eckert & Ziegler Nuclitec Gmbh,*
> 505 Fed. Appx. 281 (4th Cir. 2013) ............................................................16

*Best v. City of Portland,*
> 554 F.3d 698 (7th Cir. 2009) ........................................................................13

*Brinegar v. United States,*
> 338 U.S. 160 ........................................................................23

*Brown v. Darcy,*
> 783 F.2d 1389 (9th Cir. 1986) ........................................................................49

*Brown v. Nucor Corp.,*
> 576 F.3d 149 (4th Cir. 2009) ........................................................................57

*California v. Cathren,*
> 2009 Cal. App. LEXIS 5553 (Cal. App. 2009) ............................................32

*California v. Davenport,*
    906 P.2d 1068 (Cal. 1995)................................................................27

*California v. Younger,*
    101 Cal.Rptr.2d 624 (Cal. App. 2000) ...........................................57

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)........................................................................12

*Clinton v. Jones,*
    520 U.S. 681 (1997)........................................................................11

*Cloaninger v. McDevitt,*
    555 F.3d 324 (4th Cir. 2009) .........................................................23

*Connecticut v. Courchesne,*
    998 A.2d 1 (Conn. 2010) ................................................................27

*Coward v. Jabe,*
    474 Fed. Appx. 961 (4th Cir. 2012), ........................................22, 43

*Daubert v. Merrell Dow Pharms.,*
    509 U.S. 579 (1993)........................................................................49

*Dirks v. Martinez,*
    414 Fed. Appx. 961 (9th Cir. 2011) ...............................................20

*Doe v. Broderick,*
    225 F.3d 440 (4th Cir. 2000) .........................................................26

*Durham v. Horner,*
    690 F.3d 183 (4th Cir. 2012) .........................................................59

*East Coast Hockey League, Inc. v. Professional Hockey Players Ass'n,*
    322 F.3d 311 (4th Cir. 2003) .........................................................11

*Elmore v. Ozmint,*
    661 F.3d 783 (4th Cir. 2011) .........................................................27

*Erwin v. United States,*
    591 F.3d 313 (4th Cir. 2010) ....................................................17, 19

*Evans v. Chalmers*,
    703 F.3d 636 (4th Cir. 2012) ........................................................15, 24, 59

*Evans v. Technologies Applications & Serv. Co.*,
    80 F.3d 954 (4th Cir. 1996) ........................................................12

*Florida v. Royer*,
    460 U.S. 491 (1983)........................................................33

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997)........................................................47

*Gilker v. Baker*,
    576 F.2d 245 (9th Cir. 1978) ........................................................26

*Gomez v. Atkins*,
    296 F.3d 253 (4th Cir. 2002), *cert. denied*,
    537 U.S. 1159 (2003) ........................................................46

*Greater Baltimore Ctr. v. Mayor & City Council Baltimore*,
    721 F.3d 264 (4th Cir. 2013) ................................... 15, 12-13, 17, 21

*Green v. Throckmorton*,
    681 F.3d 853 (6th Cir. 2012) ........................................................20

*Grotti v. Texas*,
    209 S.W.3d 747 (Tex. App. 2006) ................................................27

*Harrods Ltd. v. Sixty Internet Domain Names*,
    302 F.3d 214 (4th Cir. 2002) ................................................13, 15

*Hoyle v. Freightliner, LLC*,
    650 F.3d 321 (4th Cir. 2011) ................................................*passim*

*Hunt v. Cromartie*,
    526 U.S. 541 (1999)........................................................17

*IAM v. Winship Green Nursing Ctr.*,
    103 F.3d 196 (1st Cir. 1996)........................................................50

*Illinois v. Gates*,
    462 U.S. 213 (1983)................................................................16

*Jaunese v. Indiana*,
    701 N.E.2d 1282 (Ind. App. 1998) ......................................52

*Jeandron v. Bd. of Regents*,
    2013 U.S. App. LEXIS 3316 (4th Cir. Feb. 14, 2013).................42

*Jones v. Shinseki*,
    446 Fed. Appx. 275 (Fed. Cir. 2011) ....................................27

*Kim v. Parcel K-Tudor Hall Farm LLC*,
    499 Fed. Appx. 313 (4th Cir. 2012) .............................................33

*Kingsland v. City of Miami*,
    382 F.3d 1220 (11th Cir. 2004) ...........................................20

*Kolakowski v. Sec'y of HHS*,
    2010 U.S. Claims LEXIS 1035 (Fed. Cl. 2010)....................32, 33

*Larimore v. Arkansas*,
    309 Ark. 414, 1992 Ark. LEXIS 384 (Ark. 1992) ......................32

*Lendo v. Gonzales*,
    493 F.3d 439 (4th Cir. 2007) ...........................................11, 13

*Livers v. Schenck*,
    700 F.3d 340 (8th Cir. 2012) ..............................................50

*Maine v. Dunn*,
    2010 Me. Super. LEXIS 141 (Me. Super. 2010).........................41

*Marshall v. Barlow's, Inc.*,
    436 U.S. 307 (1978)................................................................24

*Massachusetts v. Chambers*,
    2013 Mass. LEXIS 465 (Mass. 2013) .......................................58

*McCann v. Iroquois Mem. Hosp.*,
    622 F.3d 745 (7th Cir. 2010) ................................................46

*McEwen v. Baltimore-Washington Med. Ctr. Inc.*,
404 Fed. Appx. 789 (4th Cir. 2010) ...........................................47

*Mercantile Peninsula Bank v. French*,
499 F.3d 345 (4th Cir. 2007) ...............................18, 22, 43

*Miller v. Prince George's County*,
475 F.3d 621 (4th Cir. 2007) ......................................37

*Minnesota v. Constantine*,
2012 Minn. App. LEXIS 584 (Minn. App. 2012) ......................................41

*Montgomery v. De Simone*,
159 F.3d 120 (3d Cir.1998) ......................................20

*Muhammad v. Close*,
540 U.S. 749 (2004)......................................33

*Nader v. Blair*,
549 F.3d 953 (4th Cir. 2008) ......................................12

*New Jersey v. Jones*,
705 A.2d 805 (N.J. App. 1998) ......................................27

*News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*,
597 F.3d 570 (4th Cir. 2010) ......................................17

*Nixon v. State*,
671 S.E.2d 503 (Ga. 2009) ......................................32

*Ordinola v. Hackman*,
478 F.3d 588 (4th Cir. 2007) ......................................57

*Ornelas v. United States*,
517 U.S. 690 (1996)......................................23

*Owen v. Dep't of Corrections*,
568 F.3d 894 (11th Cir. 2009) ......................................27

*Payne v. Pauley*,
337 F.3d 767 (7th Cir. 2003) ......................................20

*Pennsylvania v. Daniels*,
    963 A.2d 409 (Pa. 2009)...........................................................26

*Ray Communs., Inc. v. Clear Channel Communs., Inc.*,
    673 F.3d 294 (4th Cir. 2012) .........................................19, 21, 52

*Robinson v. Clipse*,
    602 F.3d 605 (4th Cir. 2010) ........................................................11

*Rosenthal v. Erven*,
    17 P.3d 558 (Or. App. 2001) ......................................................52

*Sansotta v. Town of Nags Head*,
    724 F.3d 533 (4th Cir. 2013) ......................................................21

*Santos v. Frederick County Bd. of Comm'rs*,
    725 F.3d 451 (4th Cir. 2013) ......................................................23

*Saucier v. Katz*,
    533 U.S. 194 (2001).....................................................................23

*Sims v. Great American Life Ins. Co.*,
    469 F.3d 870 (10th Cir. 2006) ....................................................27

*Sinclair v. Mobile 360, Inc.*,
    417 Fed. Appx. 235 (4th Cir. 2011) ..................................17-18, 37

*Smith v. United States*,
    353 F.2d 877 (D.C. Cir. 1965)......................................................41

*South Carolina v. Asbury*,
    493 S.E.2d 349 (S.C. 1997) ........................................................41

*South Carolina v. Commander*,
    721 S.E.2d 413 (S.C. 2011) ........................................................27

*Stanford v. Texas*,
    379 U.S. 476 (1965)......................................................................24

*Swick v. Wilde*,
    2013 U.S. App. LEXIS 12481 (4th Cir. June 19, 2013) ...............59

*Taylor v. Waters*,
  81 F.3d 429 (4th Cir. 1996) ........................................................23

*Tennessee v. Perry*,
  2008 Tenn. Crim. App. LEXIS 543 (Tenn. App. 2008)..............................27

*Underwood v. Harkleroad*,
  411 Fed. Appx. 569 (4th Cir. 2011) ...........................................37

*United States v. Arvizu*,
  534 U.S. 266 (2002)..........................................................40, 51

*United States v. Avants*,
  367 F.3d 433 (5th Cir. 2004) ..................................................27

*United States v. Bice-Bey*,
  701 F.2d 1086 (4th Cir. 1983) .................................................49

*United States v. Chandia*,
  514 F.3d 365 (4th Cir. 2008) ..................................................16

*United States v. Clinger*,
  681 F.2d 221 (4th Cir. 1982) ...............................................15, 13

*United States v. Cordoba*,
  194 F.3d 1053 (9th Cir. 1999) .................................................50

*United States v. Curbelo*,
  343 F.3d 273 (4th Cir. 2003) ...............................................19, 20

*United States v. Danso*,
  664 F.3d 936 (D.C. Cir. 2011)..................................................50

*United States v. DeVore*,
  423 F.2d 1069 (4th Cir. 1970) .................................................56

*United States v. Evans*,
  2013 U.S. App. LEXIS 17849 (9th Cir. Aug. 27, 2013)............................19

*United States v. Giles*,
  2013 U.S. App. LEXIS 7401 (4th Cir. April 12, 2013) ........................15, 13

*United States v. Griffin*,
    589 F.3d 148 (4th Cir. 2009) ........................................................18

*United States v. Hands*,
    184 F.3d 1322 (11th Cir. 1999) ...................................................50

*United States v. Harris*,
    403 U.S. 573 (1971)......................................................................26

*United States v. Howard*,
    489 F.3d 484 (2d Cir. 2007) ........................................................16

*United States v. Infante-Ruiz*,
    13 F.3d 498 (1st Cir. 1994)...........................................................26

*United States v. Johnson*,
    495 F.2d 378 (4th Cir. 1974) ........................................................23

*United States v. Kwong*,
    69 F.3d 663 (2d Cir. 1995) ...........................................................50

*United States v. Lallemand*,
    989 F.2d 936 (7th Cir. 1993) ........................................................52

*United States v. Leak*,
    123 F.3d 787 (4th Cir. 1997) ........................................................20

*United States v. Leon*,
    468 U.S. 897 (1984).......................................................................24

*United States v. Mitchell*,
    429 Fed. Appx. 271 (4th Cir. 2011) ........................................47, 48

*United States v. Mohammed*,
    693 F.3d 192 (D.C. Cir. 2012).......................................................56

*United States v. Montgomery*,
    635 F.3d 1074 (8th Cir. 2011) ......................................................50

*United States v. NCR Corp.*,
    2013 U.S. Dist. LEXIS 62265 (E.D. Wis. 2013) ..........................27

*United States v. Prince-Oyibo*,
    320 F.3d 494 (4th Cir. 2003) ........................................................47

*United States v. Pulido*,
    69 F.3d 192 (7th Cir. 1995) ....................................................47, 48

*United States v. Scheffer*,
    523 U.S. 303 (1998)...................................................................48

*United States v. Shepherd*,
    714 F.2d 316 (4th Cir. 1983) ......................................................23

*United States v. Sowards*,
    690 F.3d 583 (4th Cir. 2012) ...................................23, 24, 26, 33

*United States v. Stanley*,
    2013 U.S. App. LEXIS 14643 (4th Cir. June 19, 2013) .............49

*United States v. Villalpando*,
    588 F.3d 1124 (7th Cir. 2009) ....................................................56

*United States v. Watson*,
    703 F.3d 684 (4th Cir. 2013) ......................................................40

*United States v. Williams*,
    95 F.3d 723 (8th Cir. 1996) ........................................................48

*Varghese v. Honeywell Int'l, Inc.*,
    424 F.3d 411 (4th Cir. 2005) ......................................................19

*Wallace v. Kato*,
    549 U.S. 384 (2007).....................................................................13

*Watson v. Brown*,
    446 Fed. Appx. 643 (4th Cir. 2011) ...........................................46

*Welch v. Workman*,
    639 F.3d 980 (10th Cir. 2011) ....................................................58

*White v. Wright*,
    150 Fed. Appx. 193 (4th Cir. 2005) ...........................................60

*Whitlock v. Brueggemann*,
        682 F.3d 567 (7th Cir. 2012) ................................................ 60-61

*Willis v. Town of Marshall*,
        426 F.3d 251 (4th Cir. 2005) ....................................................15

*Ybarra v. Illinois*,
        444 U.S. 85 (1979).....................................................................40

## STATUTES:

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

42 U.S.C. § 1983 ................................................................2, 8, 19, 60

S.C. Code § 16-15-60 (2012) .............................................................52

## CONSTITUTIONAL PROVISIONS:

U.S. Const. amend IV .................................................................*passim*

U.S. Const. amend V.....................................................................2, 14

U.S. Const. amend XIV .............................................................2, 59, 61

## RULES:

Fed. R. Civ. P. 56(a)..........................................................................16

Fed. R. Civ. P. 56(d) ......................................................................3, 12

Fed. R. Civ. P. 56(f) ..........................................................................13

Fed. R. Evid. 201(b)(2) ......................................................................42

Fed. R. Evid. 702(c)-(d) .....................................................................49

## OTHER:

2010 AMERICAN HEART ASSOCIATION—CPR GUIDELINES,
http://circ.ahajournals.org/cgi/content/full/122/18_suppl_3/S729
    (available 10/12/13) ............................................................. 31

Albert Ellis, *Healthy and disturbed reasons for
having extramarital relations*,
    16 J. OF HUMAN RELATIONS 490 (1968) ...................................... 57

American Ass'n for Marriage & Family Therapy, *Infidelity*
http://www.aamft.org/iMIS15/AAMFT/About/About_
AAMFT/Content/About_AAMFT/About_AAMFT.aspx?
hkey=a8d047de-5bf7-40cd-9551-d626e2490a25) (available 10/23/13) ................ 57

Anthony Brown, BODYGUARD OF LIES: THE STORY BEHIND D-DAY (2007) ............. 55

Charles Corr, DEATH AND DYING (2012) ....................................... 58

Christine Orthmann, CRIMINAL INVESTIGATION (2012) ......................... 32

Dariusz Galasiński, THE LANGUAGE OF DECEPTION (2000) ....................... 50

Dr. Laurence Miller, *Sex, Lies, and Police Work,* PoliceOne.Com
(available 10/27/13) http://www.policeone.com/health-fitness/articles/
1182709-Sex-lies-police-work/) October 10, 2006 ............................. 53

Dr. Philip Culbertson, CARING FOR GOD'S PEOPLE (2000) ....................... 58

Drummond Ayres, *14 Presidents Have Been the Talk of the Pillow*,
N.Y. TIMES (available10/23/13 at http://www.nytimes.com/1998/
01/25/us/president-under-fire-history-14-presidents-have-been-
talk-pillow.html (January 25, 1998) ........................................ 53

EXODUS 20:16 (New Int'l Version 2011) ...................................... 54

PSALM 12:2 ............................................................... 54

FBI/BJS, CRIME IN THE UNITED STATES 2006, Table 19 (available
10/23/13 at http://www2.fbi.gov/ucr/cius2006/data/table_19.html) ............ 41

Gary Neuman, EMOTIONAL INFIDELITY (2002) ....................................................52

Geraldine Humphrey, COUNSELING FOR GRIEF (2d ed. 2007) .............................58

Irene Tsapelas, *Infidelity*, in THE DARK SIDE OF CLOSE RELATIONSHIPS
(Cupach & Spitzberg, eds.) (2010) ...................................................................57

J.E. Adler, *Lying*, 94 J. OF PHILOSOPHY (1997) ...............................................55

John Mearsheimer, WHY LEADERS LIE (2010) ....................................................55

John Stephenson, DEATH, GRIEF, AND MOURNING (1985).....................................58

Josephine Ross, *"He Looks Guilty,"*
    65 U.PITT.L.REV. 227 (2004) ....................................................................50

Julia Omarzu, *Motivations [for] extramarital relationships*,
    24 INT'L J. OF SEXUAL HEALTH 154 (2012) ..................................................57

Laura Meckler, *Secret Service to Get a Closer Look: Obama,
Lawmakers Expect Probe After Alleged Prostitution Scandal Involving
Agents in Colombia*, available10/15/13 at http://online.wsj.com/article/
SB10001424052702304818404577346260235734298.html)
    WSJ ONLINE (April 16, 2012)........................................................................53

*Making a 'break-in' too easy*, (available 10/23/13 at
http://www.consumerreports.org/cro/magazine-archive/
2011/june/money/how-to-protect-yourself/home-security/index.htm
    CONSUMER REPORTS (June, 2011)................................................................41

Miller, *Police families: Stresses, syndromes and solutions*,
    35 AMERICAN J. FAMILY THERAPY (2007)....................................................53

Milton Pollack, J., *Parallel Civil and Criminal Proceedings*,
    129 F.R.D. 201 (1990).................................................................................13

*Murder in Families* (available10/23/13 at
http://www.bjs.gov/content/pub/pdf/mf.pdf) (July 1994) ...............................41, 42

Nancy Yeend, *Problem-Solving*,
    48 JUDGES' JOURNAL 20 (2009)...................................................50

P.V. Guharaj, FORENSIC MEDICINE (2003) ...........................................32

Professor Carl Schneider,
*Moral Discourse and the Transformation of American Family Law*,
    83 MICH.L.REV. 1803 (1995)........................................................52

Professor Eric Anderson,
*Five Myths About Cheating*,
    WASHINGTON POST (February 13, 2012) ......................................53

Richard Chisholm,
*"The Intent to Deceive,"*
    74 J. OF PHILOSOPHY 143 (1977) ................................................55

Sammy Fretwell,
*The Wrong Man*, THE STATE, (available 10/23/13 at
http://www.thestate.com/2009/07/11/859566/the-wrong-man-leon-lott-apologizes.html#storylink=cpy) (July 11, 2009) .......................................7

"Seven Sages of Greece," Chilon of Sparta (circa 600 BC).
*De mortuis nil nisi bonum*, WIKIPEDIA, (available 10/23/13 at
http://en.wikipedia.org/wiki/De_mortuis_nil_nisi_bonum on 06032012) ..............57

Sissela Bok, LYING: MORAL CHOICE IN PUBLIC AND PRIVATE LIFE (1978) ...55, 56

State Farm Press Release, *Nine out of 10 Americans are vulnerable to home
break-ins*, (available10/23/13 at http://www.statefarm.com/about/media/
media_releases/prevent_home_theft.asp) (Dec. 4, 2008)........................................41

Stuart James, FORENSIC SCIENCE, (3d ed. 2009) ....................................32

Ulrich Boser, *We're All Lying Liars*, U.S. NEWS (emphasis added; available
10/23/13 at http://health.usnews.com/health-news/family-health/brain-and-behavior/articles/2009/05/18/were-all-lying-liars-why-people-tell-lies-and-why-white-lies-can-be-ok) (May 18, 2009)...................................................54, 55

xvi

W.C. Thompson,
*Painting the Target Around the Matching Profile*,
   8 LAW, PROBABILITY & RISK 257 (2009)......................................................33

Warren Wiersbe, MINISTERING TO THE MOURNING (2006)...................................58

William Shakespeare, *Sonnet* (1599).......................................................55

## JURISDICTIONAL STATEMENT

Plaintiff/Appellant invoked the District Court's jurisdiction under 28 U.S.C. §1331. (JA10-¶2). That court entered final judgment in Defendants/Appellees' favor, on all claims, on September 28, 2012 (JA781). That court denied Plaintiff's motion for reconsideration on January 31, 2013. (JA822)**.** Plaintiff timely filed a notice of appeal on February 26, 2013. (JA828). This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.    Did the District Court err in granting summary judgment for Defendants on Plaintiff/Appellant's civil rights claims for "false-arrest" and "fabrication-of-evidence" because the court abused its discretion in refusing to either stay the case or continue Defendants' motion for summary judgment, inasmuch as continuances are broadly favored, in generally, and especially favored in false-arrest/fabrication cases.

2.    Did the District Court err in granting Defendants summary judgment on Plaintiff/Appellants' false-arrest claim because the court:

a.    impermissibly resolved questions regarding Plaintiff/Appellant's "credibility," which "are exclusively reserved … for the jury";

b.    further usurped the jury's function by "weigh[ing] the evidence" for "persua[siveness]"; and

1

c.    "weigh[ed] the evidence" improperly by giving Defendants every benefit of the doubt.

3.    Did the District Court err in granting Defendants summary judgment on Plaintiff/Appellants' fabrication-of-evidence claim because the court believed such Fifth Amendment Due Process claims are nothing but redundant Fourth Amendment false-arrest claims.

## STATEMENT OF THE CASE

On December 2, 2011, Plaintiff/Appellant Justin Wright Mallory, Sr., ("Justin") filed suit in the U.S. District Court for the District of South Carolina for monetary damages against three members of Richland County (South Carolina) Sheriff's Department ("RCSD"): Travis Holdorf ("Holdorf"), Stan Smith ("Smith"), and Randy Strange ("Strange"). (JA10). Pursuant to 42 U.S.C. §1983, Justin complained Defendants violated his constitutional rights in two ways. First, Defendants violated the Fourth and Fourteenth Amendments by falsely arresting him (*i.e.*, without probable cause) for the May 14, 2006 murder of his wife, Nekia Mallory ("Nekia"). Second, they violated the Fifth and Fourteenth Amendments by fabricating evidence with Joshua Porch (who testified at Justin's trials as an alleged witness to Nekia's murder) in support of Justin's arrest and eventual prosecution. *Id.* On December 5, 2008, a South Carolina court acquitted Justin of

Nekia's murder. (JA13-¶17; JA22-¶15). Porch then confessed to Nekia's murder; he was indicted and remains incarcerated pending trial. *Id.*

The three Defendants filed a consolidated Answer, denying all claims, on December 20, 21012. (JA19). They simultaneously moved for summary judgment. (JA27).

Justin did not immediately oppose Defendants' motion on the merits. Instead, pursuant to Fed.R.Civ.P. 56(d), he moved to stay the action or to continue the summary judgment motion until he could undertake discovery, especially Porch's deposition. (JA202). Defendants opposed Justin's motion on February 10, 2012. (JA220).

On February 15, 2012, the District Court issued a wordless "Text Order" denying Justin's motion to stay the case but granting him ten additional weeks to conduct discovery. (JA4-Dkt.#19). Although the court subsequently granted Justin another, nine-week extension, (JA4-Dkt.#19), it eventually ordered him to file his summary judgment response by August 3, 2012, even if he could not depose Porch. (JA5-Dkt.#42). Porch, fearing self-incrimination, has refused to be deposed as long as his trial remains pending. Justin consequently filed his summary judgment response on the date the court specified. (JA378).

The District Court granted Defendants summary judgment on all claims in an Order and Opinion dated September 28, 2012. (JA761).

## STATEMENT OF FACTS

The following material facts are not in genuine dispute.

Nekia Mallory was viciously stabbed to death sometime in the early morning hours of Sunday, May 14, 2006. (JA455, JA762). She was murdered in the apartment she shared with her husband, Justin, in the multi-unit Hunter's Mill Complex in Richland County, 20 miles from downtown Columbia, South Carolina. (JA762). No one, besides the murderer, saw Nekia being stabbed or knew exactly when that occurred.

Justin stated he last saw Nekia alive at 9:30 p.m. the previous (Saturday) night, before he left their home and drove 30 minutes to meet his girlfriend, Rikki Cook ("Cook"), for dinner at a restaurant and then a liaison at a motel, both near Cook's Columbia apartment. (JA465, JA762-63). Justin volunteered to Defendants he never told Cook he was married, or told Nekia he had a girlfriend and was leaving that evening to meet her; instead, he prevaricated, telling Nekia he was meeting a male friend. (JA465-66, JA455-56).

Justin testified he returned home no earlier than "3:30" a.m., (JA101:8, JA455). Defendants agreed, calculating he returned "right at 3:30." (JA127:14, JA167:7-12). When Justin returned, he found his apartment's front door "unlocked" and Nekia "on the living room floor," (JA466, JA101:20), "bloody,"

4

(JA466, JA101:20), and "unresponsive." (JA455, JA102:1-7). Justin said "[s]he looked dead." (JA466).

He screamed in shock, (JA103:7), fled the apartment, and banged on neighbors' doors, yelling for help. (JA466, JA379, JA455).

Only one person responded, Shaheed Hargraves ("Hargraves"), who debated a while with his wife before answering Justin's pounding. (JA102:11-12, JA466, JA455-56). After Justin explained Nekia's condition, and his plan to rush her to the nearest hospital, Hargraves agreed to safe-keep the Mallorys' two toddlers while Justin called 911, at "3:35:04 a.m." (JA762). Justin completed that call at "3:37:32 a.m.," (JA762), and then sped Nekia in his van to the Providence Hospital Northeast. (JA466, JA102:11-14).

Nekia was "pronounced dead shortly after arriving at Providence." (JA762, JA455).

Defendant Holdorf, the RCSD's lead investigator on the case, arrived at Providence Hospital "around 5:15 a.m." (JA455). He was introduced to Justin, and asked Justin to accompany him to RCSD headquarters for questioning. (JA762, JA455, JA117:2-9). Justin agreed. (JA455). Once there, Holdorf asked Justin what he had done before Nekia died. Justin told Holdorf, (JA455-56), and then confirmed in a sworn statement, (JA466), he had been away from his home from 9:30 p.m. on Saturday night until 3:30 a.m. on Sunday morning, traveling to and

from his date with Cook. Justin was completely cooperative, volunteering Cook's contact information so RCDS investigators could interview her, agreeing to accompany them to meet her, and consenting to Defendants' warrantless searches of his home and van, as well as warrantless DNA testing of his skin and hair; "Justin was agreeable and [told Holdorf] he would do whatever we wanted." (JA455, JA763, JA21:12).

Holdorf asked Justin whom he thought might have murdered Nekia and why; Justin specified Porch, whom he said had visited the Mallorys' apartment just hours before Justin's departure and Nekia's murder. (JA763, JA456-57). Justin also stated that although he doubted Nekia had been "cheat[ing]" on him the way he had been cheating on her, he had noticed she recently had been acting suspiciously, "dressing nicer" and being "real secretive about her cellphone." (JA456, JA103:16-19).

While Holdorf was interviewing Justin, other RCSD officers were interviewing Cook and five of the Mallorys' apartment complex neighbors. (JA457-58).

After taking Justin's statement and hearing from his RCSD colleagues, Holdorf asked Justin if he was willing to take a polygraph exam, immediately; Justin unhesitatingly agreed. (JA456).

The one-page report of that exam stated it began at 9:15 a.m. on that same Sunday morning, and ended 145 minutes later, after the examiner (RCSD Investigator James White) concluded that Justin's answers to the four questions White described as the only "relevant" ones supposedly "indicated deception" by Justin, and after White and Holdorf advised Justin that he had therefore "failed" the exam. (JA78; JA458). They immediately arrested him, without a warrant, for Nekia's murder. (JA458).

The following day, May 15, 2006, the RCSD filed a unsigned, unsworn, and non-notarized affidavit for an arrest warrant, which enabled them to obtain and executed a warrant for Justin's arrest. (JA73; JA763). Justin was denied bond, (JA13-14,¶15; JA94:5-8), and remained in the Richland County Jail for 439 days, (JA14:23), before a South Carolina court acquitted him of all charges. (JA13,¶17; JA22,¶15).

On July 10, 2009, "Richland County Sheriff Leon Lott apologized publicly" to Justin and simultaneously announced that Porch—whom Justin had "told them from day one to go investigate"—had confessed to Nekia's murder. Sammy Fretwell, *The Wrong Man*, THE STATE, July 11, 2009 (available 10/23/13 at http://www.thestate.com/2009/07/11/859566/the-wrong-man-leon-lott-apologizes.html#storylink=cpy).

7

Porch was then indicted; he has been incarcerated pending trial for Nekia's murder ever since. (JA13,¶18; JA22,¶16).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Justin Mallory spent 439 in jail after he was arrested without a warrant, but before a South Carolina court acquitted him of murdering his wife, Nekia Mallory. Joshua Porch, who was a key witness against Justin, has since confessed to Nekia's murder and is awaiting trial.

The Richland County (South Carolina) Sheriff has apologized to Justin for his Department's "errors." Pursuant to 42 U.S.C. §1983, Justin filed suit for amends, and not just apologies, against three Richland County officers for "false-arrest" and "fabrication-of-evidence."

The facts of this case read like a Hollywood script.

Justin returned to the Mallorys' small suburban apartment "right at 3:30" a.m. on Sunday, May 14, 2006. He found the door unlocked and Nekia on the floor—stabbed, bloody, and dead. He saw himself as the second victim of a brutal crime and screamed for help. Defendants viewed him not only as a "usual suspect," but the only one worth investigating.

Justin's actions undoubtedly were worthy of investigation.

Thus, Justin volunteered to Defendants he had been out on a date with his girlfriend when Nekia was murdered. Justin also volunteered that he had not told Nekia he had a girlfriend or told his girlfriend he was married.

In addition, "according to Defendants," Justin "failed" a polygraph exam.

Most suspicious of all, a woman who had been visiting her boyfriend told Defendants she had heard a loud "domestic argument" 30-45 minutes Defendants' "conventional wisdom" said Nekia had been murdered.

Nevertheless, the crucial question was not whether Defendants had enough clues to <u>investigate</u> Justin but enough "trustworthy information" for probable cause to <u>arrest</u> him, especially in light of voluminous exculpatory evidence. Defendants lacked sufficient "trustworthy information" and therefore lacked probable cause. Indeed, Defendants violated fundamental Fourth Amendment standards because they ignored the facts they had gathered (or readily could have amassed) that exculpated Justin—including:

(1)    Defendants had no evidence Nekia was alive when Justin brought her the hospital and alive when he arrived home;

(2)    to the contrary, not only was Nekia "DOA" at the hospital, but actually she was "cold" to the touch and had "been gone" when she arrived;

(3)    Justin did not have "plenty of time" to kill Nekia—and to complete eleven other time-consuming tasks between in the five minutes before he arrived home "right at 3:30" and called 911 at "3:35:04 a.m.";

(4)    although Defendants reasonably theorized that a "domestic argument" preceded and precipitated Nekia's murder, they ignored the fact that Justin could not have been party to that "argument" because it began at least 27 minutes before he returned home "right at 3:30";

(5)    two eyewitnesses saw Nekia entertaining a "black male," like Porch, in the Mallory apartment around midnight, while Justin was miles away entertaining his girlfriend;

(6)    Nekia's throat was slashed by a left-handed assailant (like Porch, but unlike Justin); and

(7)    Justin quit the polygraph exam—rather than "failing" it—after refusing to answer such "loaded" questions as "did you believe you get away with murdering your wife?"

The District Court violated equally well-established summary judgment standards in granting Defendants summary judgment on all claims. Thus, although "[c]redibility determinations … are jury functions," the court accepted Defendants' invitation to weigh Justin's credibility.

The court also invaded the jury's domain by weighing the evidence, not to determine if there were triable issues of material fact and if ""reasonable jury rationally could find" for Justin, but simply to see if it could be "persuaded" Defendants had probable cause.

Further, the court weighed the evidence inappropriately, giving Defendants every benefit of the doubt.

The court also erroneously dismissed Justin's Due Process/fabrication-of-evidence claim as a merely redundant Fourth Amendment false-arrest claim,

although all Circuits "agree that the deliberate manufacture of false evidence contravenes the Due Process Clause."

Finally, the court erroneously rejected Justin's motion for a continuance so he could depose Porch, even though continuances are "broadly favored," especially in false-arrest/fabrication cases.

Justin and the other members of Nekia's family are seeking closure in Porch's pending trial. Justin also is seeking justice in this appeal.

## ARGUMENT

### STANDARDS OF REVIEW

Federal courts enjoy "broad discretion" to stay or continue proceedings. *Clinton v. Jones*, 520 U.S. 681, 706 (1997). Thus, this Court reviews decisions regarding stays or continuances for abuse of discretion. *Lendo v. Gonzales*, 493 F.3d 439, 441 (4th Cir. 2007).

This Court "exercise[s] plenary review" of a grant of summary judgment, *East Coast Hockey League, Inc. v. Professional Hockey Players Ass'n*, 322 F.3d 311, 314 (4th Cir. 2003), and assesses "*de novo*" whether summary judgment was warranted, *Robinson v. Clipse*, 602 F.3d 605, 607 (4th Cir. 2010), *i.e.*, whether "the evidence … is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## I.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR DEFENDANTS BECAUSE THE COURT ABUSED ITS DISCRETION IN REFUSING TO STAY THE CASE OR CONTINUE CONSIDERATION OF DEFENDANTS' SUMMARY JUDGMENT MOTION

The District Court erred in granting summary judgment for Defendants because the court abused its discretion in denying Justin's Fed.R.Civ.P. 56(d) motion to either stay the case or continue consideration of Defendants' summary judgment motion, (JA27)—which they had filed just 18 days after Justin filed his complaint and "before any discovery had been conducted." (JA766). Justin's motion argued he needed either a stay or a continuance long enough to enable him to depose Porch, whose testimony remains central to Justin's "fabrication of evidence" claim against Defendants. (JA202).

"[S]ummary judgment is appropriate only after 'adequate time for discovery,' and 'must be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'" *Evans v. Technologies Applications & Serv. Co*., 80 F.3d 954, 961 (4th Cir. 1996)(emphasis added; quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). *See Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).

Continuances on summary judgment motions are "'broadly favored and should be liberally granted because [Rule 56(d)] is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose.'" *Greater Baltimore Ctr. v. Mayor & City Council Baltimore*, 721 F.3d

12

264, 281 (4th Cir. 2013)(emphasis added). *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245 n.18 (4th Cir. 2002).

Continuances are especially favored in false-arrest/fabrication cases. It is "established polic[y]," *Lendo*, 493 F.3d at 441, that "[i]f a plaintiff files a false-arrest claim ... to stay the civil action until … the criminal case is ended." *Wallace v. Kato*, 549 U.S. 384, 393-94 (2007). *See Best v. City of Portland*, 554 F.3d 698, 699-700 (7th Cir. 2009); Milton Pollack, J., *Parallel Civil and Criminal Proceedings*, 129 F.R.D. 201, 203-06 (1990).

The criteria for "seeking a continuance to secure the attendance of a witness" are well "established," too. Consistent with Rule 56(f)'s affidavit requirement, the

> party seeking [the] continuance … must demonstrate (1) who the witness is, (2) what his or her testimony will be, (3) that the testimony will be relevant to the case and competent, (4) "that the witness can probably be obtained if the continuance is granted," and (5) that counsel has exercised due diligence to obtain the witness's attendance for the trial as set.

*United States v. Giles*, 2013 U.S.App.LEXIS 7401, *11 (4th Cir. April 12, 2013)(quoting *United States v. Clinger*, 681 F.2d 221, 223 (4th Cir. 1982)(citing omitted)).

Justin's complaint and stay brief, together with and the affidavit of his undersigned counsel, J. Edward Bell, III, that accompanied the brief, (JA216),

showed he satisfied each of these five criteria. *First,* Justin identified Porch as the witness whose testimony was "crucial[ly] needed." (JA13-15, JA216-217). *Second*, he explained he expected Porch's testimony would substantiate Justin's fabrication-of-evidence claim. (JA13-14; JA217). *Third*, he explained Porch was competent and that his testimony was relevant to Justin's fabrication claim. (JA208-11; JA216-18).

*Fourth*, Justin explained that Bell had exercised due diligence in seeking to interview Porch several times, both before and after Justin filed suit, (JA217-18), but that Porch's attorneys had rebuffed those requests "while [Porch's] current [murder] charges [we]re pending" and "represented [Porch] would assert his Fifth Amendment rights if [Justin] attempt[ed] to subpoena him" so long as those "charges [we]re pending." (JA217). *Finally*, he explained Porch's availability is likely, once charges against him no longer were "pending" against him." (JA217-18).

Tellingly, although Defendants opposed Justin's motion, (JA220), they neither controverted Justin's factual averments nor suggested they would be prejudiced by a stay or continuance. Instead, they simply asserted: "the predominant judicial trends underlying a motion to stay in these circumstances are absent here." (JA229).

This Court should reverse the District Court's Text Orders denying a sufficiently long continuance because Justin satisfied each of the *Giles/Clinger* criteria and because those wordless Text Orders unreasonably deprived Justin of "adequate time" to depose Porch, *Evans*, 80 F.3d at 961, and thus arbitrarily denied him an adequate opportunity to effectively oppose Defendants' summary judgment motion. *Greater Baltimore*, 721 F.3d at 281. *See Willis v. Town of Marshall*, 426 F.3d 251, 263-64 (4th Cir. 2005)(reversing summary judgment as "premature" because non-movant could not undertake essential discovery); *Harrods*, 302 F.3d at 244 (same).

## II.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANTS ON JUSTIN MALLORY'S FALSE-ARREST"/LACK OF PROBABLE CAUSE CLAIM

### A.  <u>Introduction</u>

The District Court's Order and Opinion granting Defendants' summary motion, (JA761-780), provided more words than the court's mute Text Orders denying Justin's stay/continuance motion. Nevertheless, that Opinion provided hardly any more explanation for the Order, especially regarding the dismissal of Justin's false-arrest claim.

Instead of explicating its reasoning, the court simply summarized Defendants' "assert[ions] that the reasonable conclusions of their investigation established probable cause," JA771, ignored Justin's evidence in support of his

counter-arguments, and then conclusorily stated it had been: "<u>persuaded</u> by the evidence of record that at the moment of Plaintiff's arrest and under the facts and circumstances known to Defendants at the time, a reasonable law enforcement officer would have believed that there was a probability that Plaintiff was responsible for the murder of his wife," (JA779 (emphasis added)), *i.e.*, without identifying what "evidence" it found "persua[sive]" and why.

The District Court's conclusory approach is inappropriate on summary judgment motions, *Best Med. Int'l, Inc. v. Eckert & Ziegler Nuclitec Gmbh*, 505 Fed.Appx. 281, 284 (4th Cir. 2013), and its "'mere ratification of the bare conclusions of others,'" was particularly improper in considering probable cause. *United States v. Chandia*, 514 F.3d 365, 373 (4th Cir. 2008)(quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). *See Beck v. Ohio*, 379 U.S. 89, 92 (1964); *United States v. Howard*, 489 F.3d 484, 495-96 (2d Cir. 2007).

The court compounded these procedural errors by substantive errors in applying the summary judgment standards to the facts of this case.

## B.  <u>The Summary Judgment Standards</u>

The standards for summary judgment are well-established. Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Facts are 'material' when they might affect the outcome of

16

the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).

In assessing whether a "genuine dispute" exists, a court is required to do three things. *First*, the court "must disregard any evidence favorable to … the moving party that a jury would not be required to believe." *Erwin v. United States*, 591 F.3d 313, 327 (4th Cir. 2010). *Second*, a court must "believe[]" all of the non-movant's "evidence." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). *Finally*, a court must draw "'all justifiable inferences … in [the non-movant's] favor.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). *See Greater Baltimore*, 721 F.3d at 283.

The crucial "question at the summary judgment stage is not whether a jury is **_sure_** to find a verdict for the [non-movant]; the question is whether a reasonable jury could rationally so find." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 334 (4th Cir. 2011)(first emphasis in original). Because summary judgment is warranted only if "the evidence … is so one-sided that one party must prevail as a matter of law," *Anderson*, 477 U.S. at 255, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under **_any_** circumstances.'" *Sinclair v. Mobile 360, Inc.*, 417 Fed.Appx.

17

235, 242 (4th Cir. 2011)(emphasis added; citation omitted). *See Mercantile Peninsula Bank v. French*, 499 F.3d 345, 359 (4th Cir. 2007).

### C.    The District Court misapplied the summary judgment standards

As detailed below, the District Court made four reversible mistakes in applying these summary judgment principles to the instant case. *First*, the District Court impermissibly resolved questions of credibility, which "are exclusively reserved … for the jury." Sec*ond*, the court usurped the jury's function by "weighing the evidence" itself and then being "persuaded by the evidence" Defendants had probable cause to arrest Justin. *Third*, the court weighed the "evidence" incorrectly and improperly gave Defendants the benefit of the doubt on every disputed question. *Finally*, the court ignored the differences between false-arrest and fabrication-of-evidence claims.

#### 1.    The District Court impermissibly resolved credibility questions, which "are exclusively reserved … for the jury"

As discussed in Section II-C-5, below, one of the key assertions Defendants made in "persuad[ing]" the District Court they had probable cause for Justin's warrantless arrest was that he "lacked credibility." (JA779)(citing JA44-45)). Although a jury legitimately may consider credibility, *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 2257 (2010), and although a judge legitimately may weigh a witness' "'credibility during a pre-trial motion to suppress,'" *United States v. Griffin*, 589 F.3d 148, 150-51 n.1 (4th Cir. 2009)(citation omitted), the District

18

Court had no authority to consider anyone's credibility on summary judgment, especially the non-movant's.

To the contrary, few things are better settled than the rule that "<u>credibility determinations are not fodder for summary judgment proceedings</u>. 'It is not our job to weigh the evidence … or [even] to disregard stories that seem hard to believe. Those tasks are for the jury.'" *Ray Communs., Inc. v. Clear Channel Communs., Inc.*, 673 F.3d 294, 305 (4th Cir. 2012)(emphasis added; citation omitted). Indeed, this Court, and "the Supreme Court ha[ve] repeatedly instructed that [<u>credibility</u>] <u>determinations are exclusively reserved … for the jury</u>." *United States v. Curbelo*, 343 F.3d 273, 281 (4th Cir. 2003)(emphasis added). *See Anderson*, 477 U.S. at 255 (on summary judgment, "[c]redibility determinations ... are jury functions, not those of a judge."); *Erwin*, 591 F.3d at 327 (same).[1]

Because these principles apply in Section 1983 cases (including ones advancing false-arrest or fabrication-of-evidence claims) as much as in any other case, this Court, and every other Circuit that has considered whether courts may

---

[1]    This black-letter rule is based on centuries of experience, which teaches that "'credibility assessments that [are based on] a pretrial paper record'"—without hearing the person whose credibility was weighed (or, as in this case, even hearing the Defendants who asserted Justin "lacked credibility")—are utterly unreliable. *Varghese v. Honeywell Int'l, Inc.*, 424 F.3d 411, 422 (4th Cir. 2005)(citation omitted). Cf. *United States v. Evans*, 2013 U.S.App.LEXIS 17849, *29 n.13 (9th Cir. Aug. 27, 2013).

weigh credibility in such matters, has held credibility issues are questions of fact for a jury, not summary judgment by a judge. *United States v. Leak*, 123 F.3d 787, 797 (4th Cir. 1997)("we would invade the province of the jury if we were to find … claims of [innocence] were too 'incredible' to be believed.").[2]

The District Court violated this Court's and the Supreme Court's "repeated[] instruct[ions]," *Curbelo*, 343 F.3d at 281, by even considering Defendants' doubts about Justin' credibility.

### 2. The District Court usurped the jury's function by "weigh[ing] the evidence" for "persua[siveness]"

The District Court also usurped the jury's function by taking it upon itself to decide whether Defendants' evidence made a sufficiently "persua[sive]" case for probable cause. (JA779). The proper question was not, as the court stated, whether it could be "persuaded by the evidence of record" Defendants deserved summary judgment because "there was a probability that Plaintiff was responsible for the murder of his wife." (*Id.*; emphasis added). Rather, its task was "'only [to] determine "whether there is a genuine issue for trial'"" on that ultimate question.

---

[2]      *See Green v. Throckmorton*, 681 F.3d 853, 862 (6th Cir. 2012)(reversing summary judgment because "probable-cause inquiry turned on the credibility of the officer," which "should go to the jury."). *See also Dirks v. Martinez*, 414 Fed.Appx. 961, 962 (9th Cir. 2011); *Kingsland v. City of Miami*, 382 F.3d 1220, 1233 (11th Cir. 2004); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *Montgomery v. De Simone*, 159 F.3d 120, 125 (3d Cir.1998).

20

*Sansotta v. Town of Nags Head*, 724 F.3d 533, 539 (4th Cir. 2013)(citation omitted).

It is elementary that in considering a summary judgment motion, a court has no authority "'to [test] the evidence'" for persuasiveness or even "'to disregard stories that seem hard to believe. Those tasks are for the jury.'" *Ray Communs.*, 673 F.3d at 305 (citation omitted). Hence, "'the judge's function is not himself to weigh the evidence and determine the truth of the matter but only to determine whether there is a genuine issue for trial.'" *Greater Baltimore*, 721 F.3d at 283 (quoting *Liberty Lobby*, 477 U.S. at 249).

The District Court committed plain error because it wrongly asked whether it could be "persuaded by the evidence" that Justin's arrest was supported by probable cause (JA779), held it was so "persuaded," and thereby exceeded its authority.

### 3.    The District Court weighed the "evidence" incorrectly and improperly gave Defendants every benefit of the doubt

The District Court summarized Defendants' four asserted grounds for summary judgment on Justin's false-arrest claim as follows:

> *First*, Plaintiff had sufficient opportunity to commit the murder … based on [Defendants'] timeline of events, Plaintiff had plenty of time to drop Cook off at approximately 3 a.m., drive 19 minutes home, partake in an explosive altercation with his wife, commit the murder at approximately 3:30 a.m., and call 911 at about 3:35 a.m. *Second*, there were no signs of forced entry at the

21

> crime scene …. *Third*, Plaintiff was further incriminated by Tribble's account, which included hearing a domestic argument between a man and a woman …. *Fourth*, Plaintiff lacked credibility with Defendants in the early stages of the investigation after (1) Plaintiff professed to having a "perfect" marriage while engaging in an affair that required lying to both his wife and his girlfriend and (2) he failed a polygraph examination.

(JA771-72)(citations omitted). The District Court weighed the evidence on each point and then agreed—in a single sentence, bereft of any analysis—that it had been "persuaded by the evidence of record" regarding these four factors "that at the moment of Plaintiff's arrest and under the facts and circumstances known to Defendants at the time, a reasonable law enforcement officer would have believed that there was a probability that Plaintiff was responsible for the murder of his wife." (JA779).

Even if the District Court had the authority to weigh the evidence to determine if Defendants had probable cause—rather than merely determining if there was no genuine issue for trial regarding probable cause because the evidence was so "clear," *Mercantile Bank*, 499 F.3d at 359, and "'one-sided,'" *Coward v. Jabe*, 474 Fed.Appx. 961, 962-63 (4th Cir. 2012), that no "reasonable jury could rationally find" probable cause was lacking, *Hoyle*, 650 F.3d at 334—the District Court wrongly gave Defendants the benefit of the doubt on every point.

Most important, the District Court also failed to appreciate the difference between the minimal amount of "particularized" facts needed to simply "stop" and

investigate a criminal suspect, *Ornelas v. United States*, 517 U.S. 690, 696 (1996), and the higher quality of information—"'trustworthy information'"—required for an arrest. *United States v. Sowards*, 690 F.3d 583, 588 (4th Cir. 2012)(quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).[3] "Each category represents differing degrees of restraint and, accordingly, requires differing levels of justification." *Santos v. Frederick County Bd. of Comm'rs*, 725 F.3d 451, 460 (4th Cir. 2013)(citation omitted).

"'The substance of all the definitions of probable cause [to arrest] is a reasonable ground for belief of guilt,'" not just reasonable grounds to investigate; indeed, "'[t]he history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would leave law-abiding citizens at the mercy of the officers' whim or caprice.'" *Sowards*, 690 F.3d at 588 n.3 (quoting *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)).[4] Thus, "probable cause exists" if and only if, "given the totality of

---

[3]    The *Beck/Sowards* "trustworthy information" standard is hardly a new or disfavored one. To the contrary, this Court has regarded that test as the touchstone of probable cause analysis for decades. *See*, e.g., *Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009); *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996); *United States v. Shepherd*, 714 F.2d 316, 321 (4th Cir. 1983); *United States v. Johnson*, 495 F.2d 378, 381 (4th Cir. 1974). *See also Saucier v. Katz*, 533 U.S. 194, 206-07 (2001).

[4]    These principles are especially important when warrantless arrests are challenged. The Supreme Court has "expressed a strong preference for warrants," precisely because a warrant "provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against [constitutional] improp[rieties] than the

the circumstances, the officer 'had reasonably <u>trustworthy information</u> …
sufficient to warrant a prudent [person] in believing that the petitioner had
committed or was committing an offense.'" *Id.*, 690 F.3d at 588 (emphasis added;
quoting *Beck*, 379 U.S. at 91 (1964)).

In this case, Defendants failed to propound—and the District Court failed to
find—sufficient "trustworthy information" regarding any of the four factors they
said, and the District Court agreed, showed they had probable cause for Justin's
warrantless arrest, *i.e.*: (1) Defendants' "timeline"; (2) Justin's supposed "lack[]"
of "credibility"; (3) Tribble's supposedly "incriminating" account; and (4) Justin's
supposedly unique access to and familiarity with his apartment.

Each point is discussed in turn.

> **(a)** **The District Court was erroneously "persuaded" that
> Defendants' "timeline" showed Justin had "plenty of
> time" to kill Nekia**

Defendants' first and most important "assert[ion]" in support of their
contention that "their investigation established probable cause" of Justin's guilt
was "based on their timeline of events," which supposedly showed Justin "had

---

hurried judgment of a law enforcement officer 'engaged in the often competitive
enterprise of ferreting out crime'" *United States v. Leon*, 468 U.S. 897, 913-14
(1984)(citation omitted). *See Evans v. Chalmers*, 703 F.3d 636, 663-64 (4th Cir.
2012). These concerns about warrantless searches derive from Parliament's abuses
of the American colonists, which impelled the Fourth Amendment's warrant
requirement. *See Atwater v. Lago Vista*, 532 U.S. 318, 328 (2001); *Marshall v.
Barlow's, Inc.*, 436 U.S. 307, 311 (1978); *Stanford v. Texas*, 379 U.S. 476, 481-82
(1965).

sufficient opportunity" to murder Nekia, *i.e.*, "plenty of time to drop Cook off at approximately 3 a.m., drive 19 minutes home, partake in an explosive altercation with his wife, commit the murder at approximately 3:30 a.m., and call 911 at about 3:35 a.m." (JA771, citing JA43). (As noted above, Defendants ultimately calculated Justin arrived home "right at 3:30.").

The foundation of Defendants' "timeline" was "the <u>conventional wisdom</u> that [Nekia's] murder took place at approximately 3:30 a.m." (JA32, emphasis added). Building on that base of "conventional wisdom," Defendants' speculated "that ***if*** [Justin] indeed dropped Cook [his girlfriend] off at approximately 3:00 a.m., and ***if*** it took 19 minutes for him to return home," (JA43, emphases added; internal citation omitted), then

> it was realistic for the murder to have taken place at or about 3:30 a.m., and then [for Justin to] telephone 911 telecommunications at about 3:37 a.m. [sic]. [5] This sentiment was echoed by Holdorf who reasonably projected a five to ten minute window for Plaintiff to come home, partake in an explosive altercation resulting in the brutal attack, and then call 911.

(JA33 (internal citation omitted)).

Tellingly, the District Court's "analysis" used identical words, crediting Defendants' "reasonable conclusion" that "based on their timeline of events, [Justin] had plenty of time to drop Cook off at approximately 3:00 a.m., drive 19

---

[5]    The District Court acknowledged that 911 records showed Justin called precisely "[a]t 3:35:04 a.m." (JA762).

minutes home, partake in an explosive altercation with his wife, commit the murder at approximately 3:30 a.m., and call 911 at about 3:35 a.m." (JA771).

As shown below, the syllogism Defendants posited, and the District Court uncritically accepted, was an exercise in circular reasoning, an exercise in which the court assumed the foundation of Defendants' timeline—"the conventional wisdom" that Nekia was murdered at 3:30 a.m—was grounded on hard evidence. In reality, this foundation "wisdom" never was established by a single trustworthy fact and, indeed, was contradicted by undisputed and credible evidence.

This point is absolutely critical. It is axiomatic that probable cause cannot be bottomed on "speculative guess[work]," *Sowards*, 690 F.3d at 589, or "hunch[es]," *Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000). And the "<u>probable cause standard" certainly cannot "be satisfied merely by dependence on 'conventional wisdom</u>.'" *United States v. Infante-Ruiz*, 13 F.3d 498, 502-03 (1st Cir. 1994)(emphasis added; citing *United States v. Harris*, 403 U.S. 573, 582 (1971)). *See Gilker v. Baker*, 576 F.2d 245, 247 (9th Cir. 1978).

Three elementary principles explain why Defendants' "conventional wisdom" was anything but "trustworthy." *First*, although it certainly is physically possible to murder a living person in a few minutes, "it is legally impossible to murder a corpse." *Pennsylvania v. Daniels*, 963 A.2d 409, 426 (Pa. 2009). Consequently, any evidence "the victim was already dead" when a suspect

allegedly murdered her "undermine[s] a murder charge." *United States v. Avants*, 367 F.3d 433, 444 (5th Cir. 2004).[6]

*Second*, Defendants had the burden of proving Nekia was alive when Justin allegedly murdered her. *See Grotti v. Texas*, 209 S.W.3d 747, 759 (Tex.App. 2006). *Connecticut v. Courchesne*, 998 A.2d 1, 99 (Conn. 2010); *Tennessee v. Perry*, 2008 Tenn.Crim.App.LEXIS 543, *22 (Tenn.App. 2008); *New Jersey v. Jones*, 705 A.2d 805, 813 (N.J.App. 1998). Cf. *Owen v. Dep't of Corrections*, 568 F.3d 894, 919-20 (11th Cir. 2009).

*Finally*, a homicide victim's time of death must be determined by medical professionals; that moment cannot be established—let alone assumed, by "convention" or otherwise—by untutored police officers. *Elmore v. Ozmint*, 661 F.3d 783, 793 (4th Cir. 2011); *South Carolina v. Commander*, 721 S.E.2d 413, 415 & n.4 (S.C. 2011).[7] And Nekia's time of death certainly could not be fixed by laymen who did not witness her murder or observe her after she was assaulted but before she died.

Applying these principles to the facts of this case shows that it was anything but "clear" and "one-sided" that Nekia was alive when Justin returned home at

---

[6] *See United States v. NCR Corp.*, 2013 U.S.Dist.LEXIS 62265, *46 (E.D.Wis. 2013); *Aldridge v. Virginia*, 606 S.E.2d 539, 554 (Va.App. 2004).

[7] *See Jones v. Shinseki*, 446 Fed.Appx. 275, 277 (Fed. Cir. 2011); (*Sims v. Great American Life Ins. Co.*, 469 F.3d 870, 888 (10th Cir. 2006); *California v. Davenport*, 906 P.2d 1068, 1089 (Cal. 1995); *Baraka v. Kentucky*, 2004 Ky.App.LEXIS 51, *10 (Ky.App. 2004).

"right at 3:30." Conversely, "a reasonable jury could rationally" doubt she was alive at 3:30 and thus could rationally doubt Defendants had probable cause to arrest Justin. The District Court accordingly erred in granting summary judgment based on Defendants' "timeline." There are three reasons why.

> **(b)    The District Court erroneously assumed there was any evidence—much less "trustworthy" evidence—to support "the conventional wisdom" that was murdered at 3:30**

Defendants did not proffer and the District Court did not find any "trustworthy information"—of any kind—that substantiated their "belief" in "the conventional wisdom that [Nekia's] murder took place at approximately 3:30 a.m." (JA32). The only information they offered on this crucial point came during Defendant Strange's colloquy with Justin's counsel during Strange's deposition:

> Q:    Who determined that she was murdered at three-thirty a.m.?
>
> A:    From the amount of time it would take from when [Justin] called 911 until she arrived at the hospital she was still bleeding. And at the rate she was bleeding, she would have had to have been cut, lacerated, stabbed moments before she arrived at the hospital.
>
> Q:    And what else?
>
> A:    It's that – that time frame. I have a hard time problem with [Justin] not being home when it happened to her.

(JA500:18--JA501:6, emphases added).

28

Strange, however, did not see Nekia "still bleeding … at the hospital," or anywhere else. He was not at Providence when she "arrived" or at any time before she was pronounced dead. Nor was Holdorf, Smith, or any other RCSD officer. None of them saw her "arrive," saw her "bleeding," or saw her alive at any time or any place. And although they might have had a "hard time" abandoning their pet theory that Justin was "home when it happened to her," none of them saw Justin there at that time. Neither did anyone else.

On the other hand, there is substantial and probative evidence that Nekia was murdered **before** Justin arrived home "right at 3:30," and therefore must have been murdered by someone other than Justin. Not only did Providence medical personnel fail to confirm that Nekia was "still bleeding" and "alive" when she arrived at Providence—as Defendants hypothesized and the District Court assumed—medical personnel directly contradicted those conjectures. Thus, the official Richland County Coroner's Report and the Providence Medical Records attached to and incorporated in that Report—which Defendants' Answer said constituted "the best evidence" regarding Nekia's "time of death" (JA21,¶11, emphasis added)—established Nekia actually "was dead on [her] arrival" at Providence.

More specifically, Defendants' Answer expressly "crave[d] reference to any [sic] all reports of the Coroner's Office, and the Official Death Certificate

29

regarding the cause and time of death for the best evidence of what is contained therein." (JA21,¶11). Defendants did not, however, supply the District Court with those "best evidence" records and thus they are not part of the Joint Appendix.

Justin respectfully submits it is appropriate for this Court to take judicial notice of this "best evidence." The reasons are set forth in Plaintiff/Appellant's Motion for Leave to File Supplemental Material and for Judicial Notice, which is filed simultaneously herewith and which is incorporated herein by reference. Justin accordingly has attached true and correct copies of "any [and] all reports of the Coroner's Office," (JA21-¶11), to the Plaintiff-Appellant's Attached Supplemental Materials ("ASM"), specifically as ASM5-ASM26.

The constituent parts of the Coroner's Report explains why Providence medical staff decided Nekia was DOA. Thus, while the "Clinical Summary" section of Providence's "Report of Postmortem Examination" concluded Nekia was as "dead on arrival," (ASM25), the Report's incorporated medical records justified that conclusion: "abs[sence]" of any vital signs, (ASM23); "unresponsive," (ASM17); "no respirations," (ASM17), or "breath sounds," (ASM23); no blood pressure and "unable to get IV" started (ASM23); "pupils fixed [and] dilated," (ASM17); no "pulse" or "H[eart] R[ate]" or "EKG rhythm," (ASM23); "pulseless" and "asystole in 2 leads." (ASM26).

The testimony of Carol Wagner, R.N., in Justin's second state court trial for murder, is especially telling (ASM30-ASM33).[8] Wagner, a certified supervisor in Advanced Cardiac Life Support, (ASM31:17—ASM32:10), was the Hospital Administrator "in charge" and physically present when Nekia arrived at the Providence ER, (ASM33:6—ASM34:2), at 3:47 a.m., *i.e.*, "TIME ARRIVED: 0347." (ASM23, ASM20). Wagner agreed that Nekia had been "dead on arrival," not only because she "wasn't breathing and moving," (ASM34:17-18), but because Nekia "was already in asystole," meaning her "heart rhythm [wa]s completely flat." (ASM35:5-7); *see* (ASM22). Wagner therefore concluded that <u>Nekia had been "gone ... at least ten minutes</u>, because the heart doesn't immediately go to asystole." (ASM36:3-5)(emphasis added).[9]

Most significantly, when Wagner was asked if it was "<u>possible [Nekia] could have been breathing a few minutes before that?</u>," *i.e.,* before 3:47 a.m., she answered, categorically: "<u>No. She was cold.</u>" (ASM36:6-11)(emphases added).

---

[8]    Plaintiff/Appellant's Motion for Leave to File Supplemental Material and for Judicial Notice, which he is filing simultaneously with this brief, explains why it is appropriate for this Court to take notice of Nurse Wagner's testimony, as well as the testimony of two physicians and the Investigative Report of RCSD officer T.C. Rownd.

[9]    "Asystole," a/k/a "flatline," "represents absence of detectable ventricular electric activity," hence no cardiac contractions or blood-flow. 2010 AMERICAN HEART ASSOCIATION—CPR GUIDELINES, http://circ.ahajournals.org/cgi/content/full/122/18_suppl_3/S729 (available10/12/13).

The importance of Wagner's testimony cannot overstated.

Given the universal consensus (among courts and forensic scientists) that body temperature falls only 1.0—1.5 degrees (Fahrenheit) per hour after death,[10] and given that both Dr. Stanton Kessler (who autopsied Nekia's body for the Coroner's Office, (ASM38:21—ASM42:10) and Dr. Brian Frist (a forensic pathologist who independently reviewed the Coroner's Reports, (ASM55:19—ASM56:24), agreed that Nekia took "ten to fifteen minutes," (Kessler: ASM45:15-16, ASM48:7-13); Frist: (ASM61:13-25), to "ble[e]d out at the crime scene," (Kessler, (ASM50:8-10); Frist (ASM61:13-25)), Wagner could not have found Nekia "cold" at 3:47 a.m., when Nekia arrived at the hospital and Wagner first touched and examined her, (ASM23), if her "murder took place at approximately 3:30 a.m."—just seventeen minutes before—as Defendants hypothesized in the timeline the District Court found so persuasive.

In the final analysis, Defendants' timeline was bottomed on the notion that ***if*** Nekia was murdered at 3:30, Justin had "plenty of time" to kill her. The reasoning is sound but the premise was a fantasy, akin to saying "if my aunt were a man, she

---

[10]     *See Kolakowski v. Sec'y of HHS*, 2010 U.S.Claims LEXIS 1035, *351 (Fed. Cl. 2010)("one degree per hour"). Accord ); *California v. Cathren*, 2009 Cal.App.LEXIS 5553, *16 (Cal.App. 2009); *Larimore v. Arkansas*, 309 Ark. 414, 416, 1992 Ark.LEXIS 384, *3 (Ark. 1992). *See also Nixon v. State*, 671 S.E.2d 503, 504 (Ga. 2009)("1.5 degrees"). Cf. Stuart James, FORENSIC SCIENCE, 45 (3d ed. 2009); P.V. Guharaj, FORENSIC MEDICINE, 61-62 (2003); Christine Orthmann, CRIMINAL INVESTIGATION, 274 (2012).

would be my uncle." *Florida v. Royer*, 460 U.S. 491, 528 (1983) (Rehnquist, J., joined by Burger, C.J., and O'Connor, J., dissenting).[11]

Defendants were entitled to offer their assumption in support of their motion. The District Court, however, was not entitled to indulge that assumption in the absence of "trustworthy information." As the Supreme Court explained in reversing summary judgment in a Section 1983 suit, summary judgment "was flawed as a matter of fact" because it was based on nonexistent facts. *Muhammad v. Close*, 540 U.S. 749, 754 (2004). *See Kim v. Parcel K-Tudor Hall Farm LLC*, 499 Fed.Appx. 313, 318 (4th Cir. 2012)(reversing summary judgment because court "may have erred when it assumed" certain "facts" were true).

In this light, the "conventional wisdom" that Nekia was alive and murdered at "3:30 a.m."—the foundation of Defendants' belief that Justin murdered her then—was not a fact. Rather, it was a substitute for facts. It was a convenient assumption. It was wishful thinking. And it definitely was not the kind of "trustworthy information" required to establish probable cause, *Sowards*, 690 F.3d at 588, much less a material fact not subject to genuine dispute, the kind required

---

[11]     Courts and commentators have castigated this type of self-validating theorizing as the "Texas sharpshooter fallacy," which "receives its name from the concept of a gunslinger who fires a gun randomly at the side of a barn, and then draws a bullseye around the biggest cluster of bullet-holes." *Kolakowski v. Sec'y of HHS*, 2010 U.S.Claims LEXIS 1035, 440 n.175 (Fed. Cl. 2010). *See* W.C. Thompson, *Painting the Target Around the Matching Profile*, 8 LAW, PROBABILITY & RISK 257, 276 (2009).

to justify summary judgment. At minimum, the District Court should not have given Defendants the benefit of the doubt regarding the time Nekia was murdered because "a reasonable jury could rationally" find that Nekia was not alive and was not murdered at 3:30 a.m. *Hoyle*, 650 F.3d at 334.

> ### (c)    The District Court erroneously assumed "Tribble's account" corroborated Defendants' timeline

The District Court erroneously agreed with Defendants' "belie[f]" that Justin "was further incriminated" by the "account" of Sherry Tribble, the fiancée one of the Mallorys' neighbors, an account "which included hearing a domestic argument between a man and a woman, seeing Plaintiff's van, and watching a male individual enter Plaintiff's van and drive off." (JA771-72, citing JA42).

In reality, "Tribble's account" did not "further incriminate" Justin by corroborating Defendants' timeline. Rather, Tribble's account shredded that timeline and undermined Defendants' warrantless arrest of Justin. Tribble's "account[s]"—and there were several, both sworn and unsworn, <u>none of which she provided to Defendants until **after** Defendants arrested Justin</u>[12]—clarified what the District Court's 25-word summary conflated: she did <u>not</u> hear one continuous "domestic argument" which was immediately followed by "watching a male" flee in a van.

---

[12]    Defendants' conceded they "did not talk to [Tribble] before the arrest." (JA675:11, JA677:21-JA678:16. *See* JA458).

Instead, Tribble heard two distinct episodes of screaming, which were dissimilar in nature and occurred at two different times. According to Holdorf's rendition of her initial unsworn and undated account:

> I was over at my boyfriend's apartment. … 2:18 was the last time I looked at the clock. We were up talking in bed about a half hour-45 minutes later [when] I heard a females [sic] voice. … She was asking why and how could you. … I thought that it was a domestic [sic] and that they were arguing .… After that it was quiet for about 5-10 minutes. Then all of a sudden it was a man's voice .… He was crying and all worked up .… I did not hear her say anything.

(JA472. *See* JA459). Thus, although Tribble characterized the first episode as an angry "domestic" dialogue between a woman and a man, she described the second as a monologue, as a single man "crying," and crying alone; "I did not hear [any woman] say anything" or hear any argument of any kind. (JA472).

Even more important—much more important—Tribble said she heard the "domestic … argu[ment]" at least a "half hour-45 minutes" after "2:18 am," that is, as early as 2:48 a.m. but no later than 3:03 a.m. (JA472). Because Tribble said that "argu[ment]" occurred at least 27 minutes before Justin returned at 3:30 a.m., he could not have been party to the quarrel that Defendants said preceded and precipitated Nekia's murder.

Tribble's sworn affidavit, (JA474), subsequently clarified what her hurriedly transcribed (by Holdorf) and unsworn statement left unclear: the "period of

silence" between the couple's argument and a solitary man crying for help actually lasted "approximately 30-45 minutes," (JA474, ¶4), which matched Justin's timeline but torpedoed Defendants'. (*See* JA474, ¶4—JA475, ¶10). For reasons the District Court never explained, it completely ignored this exculpatory testimony.[13]

---

[13]      Nor was this only thing the District Court got wrong. For reasons the court never explained, it chose to base its summary of Tribble's account, (JA765), on Holdorf's summary of his initial, post-arrest telephonic conversation with her (JA68), rather than on Tribble's own written but unsworn statement, (JA472-JA-473), let alone her sworn affidavit. (JA474-JA476). In so doing, the court not only compressed Tribble's timeline of separate events into an unbroken sequence but also attributed words to her she never uttered, specifically that the man she heard arguing with a woman between 2:48 and 3:03 a.m. was "the man"—*i.e.*, the same man—she subsequently heard yelling alone. (JA765, citing JA68). But none of the statements Tribble signed, whether sworn or not, stated or suggested the first man, "a man," was identical to the second man, "the man." (JA472, JA474-75).

Finally, while the court was construing Holdorf's transcribed rendition of Tribble's oral account in a fashion that gave Defendants every benefit of the doubt—while simultaneously ignoring both Tribble's written statement and her sworn affidavit—the court was overlooking another exculpatory document referenced in Holdorf's report. Holdorf's report relied on, (JA67-69), *see* (JA34), Defendants' Memo in Support of Summary Judgment cited, (JA34), (JA577), (JA579-80), and (JA594), and the court duly cited, (JA764), an investigative report by RCSD officer T.C. Rownd. (ASM71), for the purpose of relaying the statement by Tribble's fiancée, Dennis Tentyon, who said he heard a "male voice yelling for help" around 3:18—3:23 a.m. (ASM71).

Rownd's report revealed something else, too. While Justin was entertaining Cook away from the Mallorys' apartment, Nekia was entertaining an unidentified black male (like Porch) in that apartment. Thus, Rownd's report recounted what he had heard from Glenn and Mandy Smith, who lived upstairs from the Mallorys'. They returned to their apartment "around 11:30 p.m." on that Saturday and noticed "the music was up" and "a black male"—not Justin—"lying on the [Mallorys'] couch." (ASM71).

Lastly, the court completely overlooked a second RCSD Investigative Report by David Wilson which, as summarized above, noted, *inter alia*, significant exculpatory facts that were readily known or knowable before Defendants arrested

At minimum, a "reasonable jury could rationally" find Tribble did not corroborate Defendants' timeline.

### (d) The District Court erroneously calculated that five minutes gave Justin "plenty of time" to argue with Nekia, kill her, clean up the murder scene, and beg neighbors for help before calling 911

The District Court erroneously gave Defendants the benefit of the every doubt regarding how few tasks he ostensibly completely in the five minutes between his return home "at approximately 3:30 a.m., and [his] call 911 at about 3:35 a.m." (JA771, citing JA43). Even assuming Nekia actually was alive when Justin returned home "right at 3:30," (JA127:14, JA167:7-12)—and there was no trustworthy information she was alive, but reliable evidence she was not—the court strained reason in crediting Defendants' assertion that once Justin arrived home he had "plenty of time ... to [1] partake in an explosive altercation with his

---

Justin, specifically: (1) "[t]he stab wounds to [Nekia] were on the right neck and right forehead, which would be consistent with a left-handed assailant"; (2) "Porch is left-handed"; (3) Justin is right-handed; and (4) Porch's car had easily noticeable amounts of "blood … on the driver's door, seat, and floorboard." (JA331, JA333).

Defendants did not mention these exculpatory facts in defending their arrest of Justin and the District Court ignored them in analyzing whether the evidence was so "clear" and "one-sided" that Defendants deserved summary judgment. Both erred. Defendants had a duty to discuss this information, *see Miller v. Prince George's County*, 475 F.3d 621, 630-31 (4th Cir. 2007), and the court was "'obligated to search the record and independently determine whether or not a genuine issue of fact exists'" for summary judgment purposes. *Sinclair v. Mobile 360, Inc*., 417 Fed.Appx. 235, 242 (4th Cir. 2011)(citation omitted). *See Underwood v. Harkleroad*, 411 Fed.Appx. 569, 575 (4th Cir. 2011). Reversal is warranted on both grounds.

wife, [2] commit the murder at approximately 3:30 a.m., and [3] call 911 at about 3:35 a.m." (JA771)(citation omitted).

Five minutes certainly is more than enough time for someone to argue with and then kill another person—if that is all one did. But testimony from Justin and Defendants, as well as from other RCSD investigators torpedoed this simple three-act drama of: (1) argument; (2) murder; and (3) call to 911.

This testimony from multiple sources raised substantial questions about just how many time-consuming things the murderer did—that Justin supposedly did— from "3:30 a.m.," when Justin arrived home, to "3:35 a.m.," when he called 991. To start, Defendants asserted the murderer undertook (4) "an attempt to clean up crime scene which quite frankly was extensive," (JA87), inasmuch as that "clean up" of "profuse amounts of blood due to [the] stabbing," (JA54), entailed three additional, subordinate, and time-consuming tasks: (5) "grab[bing]" "cleaning agents" and paper and cloth towels (JA457-58); (6) wiping up "blood spatters, particularly in the living room and kitchen areas," (JA33), including "blood on the floor, under the sink, on the sink and counter area," (JA82, JA457); (7) stripping off his bloody clothes and replacing them with clean ones; before (8) loading the apartment's washing machine with bloody clothes and towels, adding detergent, and then starting that machine. (JA33, JA45).

38

On the other hand, Justin denied anything to do with a "clean up," (JA33-34; JA68; JA458)—as evidenced by the fact that he needed to change out of the completely "bloody clothing" he wore to the hospital and was still wearing when Holdorf first met him. (JA66). Moreover, Justin asserted, and Defendants did not dispute, that he engaged in four different (and from Defendants' perspective, additional) time-consuming tasks in the five minutes between his arrival home "right at 3:30," and his 911 call at 3:35:04 a.m., specifically: (9) rushing out of his apartment, yelling in distress, (JA30; JA87:8-9; JA764); (10) banging and beating on the doors of several neighbors, begging for help, (JA30; JA763); (11) rousting and then speaking with one neighbor, Shadeed Hargraves, who listened to Justin's explanation of why he needed help and then agreed to provide it, (JA30; JA379); and (12) running back to his apartment with Hargraves, where Justin rousted his two toddlers and entrusted them to Hargraves' care before Justin called 911. (JA379).

In light of the many tasks that crowded into just five minutes, the District Court erred in believing Justin not only was the probable murderer but an improbably efficient one, someone who needed an average of only twenty-five (25) seconds to complete each task. Summary judgment was unwarranted because a "reasonable jury could rationally" doubt Justin was that efficient.

### 4. The District Court erroneously rubberstamped Defendants assertion they had probable cause to arrest Justin because he lived in his own apartment

The fact that Justin shared a tiny apartment with Nekia, where she was murdered, did not provide probable cause that he murdered her, let alone warrant summary judgment for Defendants.

Defendants asserted, and the District Court agreed "there were no signs of forced entry at the crime scene, which fact suggests that the assailant possessed a level of access and familiarity with the apartment home similar to what Plaintiff had." (JA771, citing JA45).

The District Court should have spurned Defendants' "suggest[ed]" inferences, rather than uncritically giving Defendants the benefit of the doubt, because they exaggerated both the difficulty of obtaining "access" to a suburban apartment without "force," in general, and then becoming "familiar[]" with the Mallorys' apartment, in particular.[14]

First, although law enforcement professionals may "draw on their own experience and specialized training to make inferences ... that 'might well elude an untrained person,'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002)(citation omitted), here both Defendants and the District Court completely ignored a fact

---

[14] Of course, "a person's mere propinquity" to suspected criminal activity "does not, without more, give rise to probable cause" to arrest him. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). *See United States v. Watson*, 703 F.3d 684, 694 (4th Cir. 2013).

well-known to many professionals, ranging from the Chief Justice of South Carolina[15] and State Farm (the nation's largest insurer) to the FBI/Bureau of Justice Statistics ("BJS") and CONSUMER REPORTS magazine: criminals—especially murderers—rarely need to "force[] entry" into a home; indeed, State Farm estimates "[n]ine out of ten Americans are vulnerable" to being assaulted in their homes, because these 90% leave their doors open, windows unlocked, or hide their house-keys in easily discovered locations.[16]

Equally important, as law enforcement professionals, Defendants should have known that the odds were 14:1 that Nekia was not killed by Justin: "[a]mong murder victims [only] 6.5% were killed by their spouses." U.S. Dept. of Justice,

---

[15]    Courts around the country, in both urban and rural jurisdictions, have noticed "it is customary for many people ... to leave their house windows open." *South Carolina v. Asbury*, 493 S.E.2d 349, 355-56 (S.C. 1997)(Toal, J., & Finney, C.J., dissenting). *See Smith v. United States*, 353 F.2d 877, 881 (D.C. Cir. 1965)("Many people often leave … their homes unlocked."); *Minnesota v. Constantine*, 2012 Minn.App.LEXIS 584, *8 (Minn.App. 2012); *Maine v. Dunn*, 2010 Me.Super.LEXIS 141, *10 (Me. Super. 2010).

[16]    *See* State Farm Press Release, *Nine out of 10 Americans are vulnerable to home break-ins*, (Dec. 4, 2008)(available10/23/13 at http://www.statefarm.com/about/media/media_releases/prevent_home_theft.asp). Similarly, "half of all 'break-ins' aren't break-ins but walk-ins." *Making a 'break-in' too easy*, CONSUMER REPORTS, June 2011 (available 10/23/13 at http://www.consumerreports.org/cro/magazine-archive/2011/june/money/how-to-protect-yourself/home-security/index.htm. *See* FBI/BJS, CRIME IN THE UNITED STATES 2006, Table 19 (available10/23/13 at http://www2.fbi.gov/ucr/cius2006/data/table_19.html).

Bureau of Justice Statistics ("BJS"), *Murder in Families* (July 1994)(available10/23/13 at http://www.bjs.gov/content/pub/pdf/mf.pdf).[17]

In other words, a person is 10 times more likely to be murdered by a "friend[] or acquaintance[] (64%)"—such as Joshua Porch—than "by their spouses" (only "6.5%" of all murderers), and 14 times more likely to be murdered by someone besides one's spouse (93.5% vs. 6.5%), *e.g.*, by a neighbor, friend, acquaintance, co-worker, former or rejected girlfriend, or family member other than one's spouse. BJS, *Murder in Families, supra.*

Defendants also exaggerated the size and complexity of the Mallorys' small, cookie-cutter apartment and the unlikelihood that someone who was not very "familiar" with it prior to Nekia's murder (*i.e.*, someone besides a spouse) could become "familiar" with it in a short span, as if the Mallorys' apartment was vast in size and bafflingly unique in layout, as if it was akin to Monticello (43 rooms, 11,000 square feet) or the Biltmore estate (250 rooms, 178,926 square feet).

Yet nothing suggests the Mallorys' apartment was large and labyrinthine. Furthermore, the notion that Nekia's killer needed to be as familiar as Justin with the apartment's layout is especially nonsensical because the apartment's front door

---

[17]    Fed.R.Evid. 201(b)(2) allows this Court to take judicial notice of "factual information found on the World Wide Web." *Jeandron v. Bd. of Regents*, 2013 U.S.App.LEXIS 3316, *10 (4th Cir. Feb. 14, 2013)(citation omitted).

opened to its combination kitchen/living-room/dining-room—where Nekia was murdered—and there was no evidence a struggle occurred in any other room.

### 5. The District Court erroneously accepted Defendants' assertion they had probable cause to arrest Justin because he "lacked credibility"

Defendants further asserted, and the District Court was persuaded, they had probable cause to arrest Justin without a warrant because he "lacked credibility." (JA772, citing JA43-44).

The District Court's ruling was incorrect both as a matter of law—because credibility questions are reserved for the jury, absolutely and unequivocally, and never can be grounds for summary judgment, *see* Section II-C-1, above—and as a matter of fact—because Defendants' allegations about Justin's credibility were more puerile than persuasive.

Thus, even if the District Court had been authorized to weigh Justin's credibility on summary judgment, the ultimate question was whether the evidence was so "clear," *Mercantile Bank*, 499 F.3d at 359 (citing *Anderson*, 477 U.S. at 255), and "'one-sided,'" *Coward*, 474 Fed.Appx. at 962-63 (quoting *Anderson*, 477 U.S. at 251-52), as to produce one indisputable inference—Justin "lacked credibility" regarding Nekia's murder—rather than a genuine question on that matter.

Subsumed under that ultimate question are three narrower ones concerning: (a) Justin's allegedly "fail[ing]" their polygraph exam, (JA772); (b) his allegedly unusual and "incredibly" immoral life (cheating on Nekia and not telling Nekia and his girlfriend about each other), (JA772); and (c) his allegedly unusual and "incredible" belief (that he enjoyed a "perfect life" with Nekia). (JA772). At minimum, "a reasonable jury could rationally" find Defendants had not established Justin lacked credibility, *Hoyle*, 650 F.3d at 334, and the District Court should have appreciated there were genuine issues regarding each allegation.

Each allegation is discussed in turn.

### (a) There is a genuine question whether Justin "failed [his] polygraph examination."

Defendants asserted and the District Court agreed Justin "lacked credibility" because "he failed a polygraph examination." (JA772, citing JA43-44).

As shown below, there is a genuine dispute whether Justin actually "failed" Defendants' polygraph exam, as he unequivocally denied lying to Defendants during that exam and denied responding deceptively to any exam questions. As also shown below, notwithstanding Justin' denial, a genuine question also exists whether the District Court should have credited Defendants' assertions that he failed the exam given that it was improperly designed and administered.

44

### (i) Justin denied failing his polygraph exam and Defendants cited no "trustworthy information" that he did

Justin disputed any "deception" on the exam and he flatly denied "fail[ing]" it. (JA478-79). He testified that he didn't fail; rather, he quit the exam after refusing to answer what he regarded as "disturbing" and impossible-to-answer trick questions, such as whether he "believed [he] would get away with [his] wife's murder?" (JA478).

The District Court never reviewed the polygraph questions and results, never queried Defendants' polygraph examiner about them, and never independently determined whether Justin truly failed that exam. Instead, the court simply credited Defendants' claim that "Plaintiff proceeded to fail the polygraph test (according to Defendants)." (JA764, citing JA159 (emphasis added)). Significantly, the sole evidence Defendants relied on regarding Justin's "fail[ure]" was White's one-page Report. (JA123).

Significantly, White's Report described the questions, answers, results, and observations of a 145-minute examination in a single, bare-boned page, indeed, in only 85 words. (JA656). That Report conclusorily pigeonholed the results of a nearly two-and-a-half hour exam in two words: "deception indicated." (*Id.*). Neither White nor Defendants "indicated" which of Justin's answers were "decepti[ve]," in what ways, or to what extent or degree. (JA656, JA 123-24).

45

In this light, the competing "factual assertions" that Justin did (or did not fail) the polygraph "effectively boiled down to a swearing contest." *Watson v. Brown*, 446 Fed.Appx. 643, 645 (4th Cir. 2011). Because the District Court was obliged to credit the non-movant's, *i.e.*, Justin's "version of events" on summary judgment, *id.*, that court erred in granting summary judgment on Defendants' testimony that the polygraph proved he had lied to them and therefore "lacked credibility." *Id. See McCann v. Iroquois Mem. Hosp.*, 622 F.3d 745, 747 (7th Cir. 2010).

> **(ii)** **The District Court erred in crediting the polygraph results because the exam had been improperly designed and administered**

Relying on dicta in *Gomez v. Atkins*, 296 F.3d 253 (4th Cir. 2002), *cert. denied*, 537 U.S. 1159 (2003), Defendants argued their decision to arrest Justin was reasonably based on White's conclusion of "deception indicated." (JA45, JA655). Although *Gomez*'s dicta noted polygraphs "are a well-recognized law enforcement technique, and a reasonable officer might take their results into account in assessing probable cause," 296 F.3d at 264 n.8, Defendants' reliance on *Gomez* is misplaced because the *Gomez* plaintiff never contested the reliability of the polygraph results, in general, or the results in that case, in particular. More important, *Gomez* certainly did not announce a *per se* rule that a court must take polygraph "results into account in assessing probable case" in <u>every</u> case. On the

other hand, this Court often has stressed that the proponent of expert testimony (such as testimony based on polygraph results, *see United States v. Mitchell*, 429 Fed.Appx. 271, 275-76 (4th Cir. 2011)), has the burden of establishing either the "indicia of reliability" for both the expert technique and testimony, *id.* at 276, or establishing "a reliable basis for [expert] conclusions." *McEwen v. Baltimore-Washington Med. Ctr. Inc*., 404 Fed.Appx. 789, 791 (4th Cir. 2010). *See United States v. Prince-Oyibo*, 320 F.3d 494, 498 (4th Cir. 2003).

In this case, Defendants offered no argument, much less evidence, that Justin's exam bore any "'indicia of reliability,'" or that the exam results were valid and reliable. Courts, moreover, are admonished to disdain even a neutral expert's naked and conclusory opinion, *i.e*., one that is "'connected to existing data only by *ipse dixit*'" of the expert. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Such caution is especially warranted regarding polygraph results. As the Seventh Circuit explained in excluding polygraph results in an essentially identical case, it was impossible to determine if the examinee "actually 'failed' the polygraph." *United States v. Pulido*, 69 F.3d 192, 205 (7th Cir. 1995).

> The polygrapher's report contains the notation "deception indicated," but … nowhere does the report specify which questions the examiner believed Lopez answered deceptively. The report does not remark on the degree or extent of deception "indicated," nor the area of inquiry in which the witness was allegedly less than forthcoming and in the technician's opinion deceptive. Thus, even assuming that polygraphs are 100 percent accurate and

reliable, this report falls short of providing an adequate basis for inferring [the examinee] lied to the police, much less that he was involved in the murders.

*Id.*

*Pulido* is on all fours with this case. *First*, as in *Pulido,* White's report "d[id] not remark on the degree or extent of deception 'indicated'" *Id.* (Compare JA655). *Second*, as in *Pulido*, White's report did not identify the "area of inquiry in which the witness was … deceptive." *Id.* (Compare JA655). *Finally*, as in *Pulido,* "nowhere d[id] [White's] report specify which questions [he] believed [Justin] answered deceptively." *Id.* (Compare JA655). *See United States v. Williams*, 95 F.3d 723, 728 (8th Cir. 1996)(excluding polygraph report because "examiner did not break down the test results to show whether [examinee] was deemed deceptive on particular questions, but simply assigned a 'deception' result to entire performance.").

Accordingly, "even assuming that polygraphs are 100 percent accurate and reliable," *Pulido*, 69 F.3d at 205—which is highly problematic, as there remains "'no consensus that polygraph evidence is reliable,'" *Mitchell*, 429 Fed.Appx. at 275-76 (quoting *United States v. Scheffer*, 523 U.S. 303, 309 (1998)—White's report still "falls short of providing an adequate basis for inferring that [Justin] lied to the police, much less that he was involved" in Nekia's murder. *Pulido*, 69 F.3d at 205.

48

Furthermore, while Defendants failed to meet their burden under Fed.R.Evid. 702(c)-(d) of showing White's expert testimony was "'the product of reliable principles and methods' that 'the expert ha[d] reliably applied … to the facts of the case,'" *United States v. Stanley*, 2013 U.S.App.LEXIS 14643, *3 (4th Cir. June 19, 2013)(citing *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993)), there was ample expert evidence demonstrating why the District Court should not have credited White's report.

Justin's forensic expert, Florida State University Criminology Professor, *Emeritus*, George Kirkham, testified Defendants administered the polygraph to Justin "under professionally improper conditions." (JA572). He explained, for example, polygraph "accuracy is greatly diminished when the person to be examined is known to be in a highly emotional, excited state at the time," which Defendants knew was true of Justin when they polygraphed him just six hours after he discovered Nekia's body. (*Id.*) [18] (Holdorf acknowledged Justin was in a ""heightened" and "excited" state, (JA119:10, JA119:16), which Holdorf conceded is typical when individuals are "having a very bad day," (JA119:12), *e.g.*, finding a spouse dead in a pool of blood).

---

[18]     *See Brown v. Darcy*, 783 F.2d 1389, 1393 (9th Cir. 1986)(stress affects accuracy); Cf. *United States v. Bice-Bey*, 701 F.2d 1086, 1091 (4th Cir. 1983).

Professor Kirkham specifically excoriated the loaded questions White put to Justin—which included asking Justin whether, "besides removing that woman," *i.e.*, Nekia, from the murder scene, "did you alter that scene in any way," (JA656), and also asking Justin "if [he] believed [he] would get away with [his] wife's murder?" (JA478-3). Kirkham explained such questions "constitute[d] egregious misconduct because any answer would be tantamount to an admission of guilt." (JA572).

Other Circuits have condemned such inquiries as "question begging," with the "most infamous example being, 'When did you stop beating your wife?'" *United States v. Danso*, 664 F.3d 936, 939 (D.C.Cir. 2011). *See* Nancy Yeend, *Problem-Solving*, 48 JUDGES' JOURNAL 20, 24 (2009). Five Circuits have excluded polygraph results where "the questions were flawed," *United States v. Montgomery*, 635 F.3d 1074, 1094 (8th Cir. 2011), or where "the examination's design and implementation were … flawed" *Livers v. Schenck*, 700 F.3d 340, 345 (8th Cir. 2012).[19]

---

[19]    *See United States v. Cordoba*, 194 F.3d 1053, 1062 (9th Cir. 1999)(citation omitted)(excluding results of "'defect[ive]'" exam: "'duration and substance of the pre-test interview was not preserved. No tape o[f] … the polygraph exam. … The examiner did not ask if Defendant had proper sleep before the exam.'"). *See also United States v. Hands*, 184 F.3d 1322, 1329 n.20 (11th Cir. 1999); *IAM v. Winship Green Nursing Ctr.*, 103 F.3d 196, 203 (1st Cir. 1996); *United States v. Kwong*, 69 F.3d 663, 668 (2d Cir. 1995). Cf. Josephine Ross, *"He Looks Guilty,"* 65 U.PITT.L.REV. 227, 244 (2004); Dariusz Galasiński, THE LANGUAGE OF DECEPTION 18-19 (2000).

**(b)    There is a genuine question whether having a extramarital affair renders the adulterer "incredible" *per se***

There is no question Justin cheated on Nekia, never told her he had a girlfriend, and never told his girlfriend he was married. In fact, Justin volunteered this information to Holdorf within minutes of meeting him. (JA455). There also is no question it was reasonable for Defendants to <u>investigate</u> him for murdering Nekia because she <u>might</u> have discovered his affair and <u>might</u> have angrily confronted him, and he <u>might</u> have killed her in response.

Rather, the issue before the District Court was whether there was anything so unique about having an affair (or so unique about Justin's affair or his dishonesty about it) that rendered Defendants' inference—a husband who cheats and is not forthcoming about it is one who kills and thus should arrested and not just investigated—so unassailable that no "reasonable jury rationally could" think otherwise. *Hoyle*, 650 F.3d at 334.

Although Defendants were entitled to use their "experience and specialized training" in drawing inferences, *Arvizu*, 534 U.S. at 273, they never referenced any "training" or "experience" that shows mendacious philanderers are uniquely likely—or even somewhat more likely—to kill their spouses. Nor could they. In fact, consensus research reveals the opposite—infidelity is commonplace and lying is nearly universal—while, as noted above, BJS data shows only 6.5% of all

murder victims are killed by their spouses, for any reason at all. Defendants may have "ha[d] a hard time" believing adulterers are not more prone to murder or a "hard time" believing Justin's did not kill Nekia, (JA501:5-6), but it was not the District Court's privilege "'to disregard stories that seem hard to believe. Those tasks are for the jury.'" *Ray Communs.*, 673 F.3d at 305 (citation omitted).

To be sure, "98% of Americans believe[] it's wrong to have an affair," Gary Neuman, EMOTIONAL INFIDELITY 29 (2002). State laws reflect these beliefs. Thus, S.C. Code §16-15-60 (2012) condemns adultery (and fornication) and makes either punishable by six-to-twelve-month sentences. But that statute, like its counterparts across the country, is "rarely" enforced. Professor Carl Schneider, *Moral Discourse and the Transformation of American Family Law*, 83 MICH.L.REV. 1803, 1818 (1995), reflecting that Americans routinely tolerate (in practice) what they resolutely condemn (in theory).

Indeed, "extramarital affairs are more common than not." *Jaunese v. Indiana*, 701 N.E.2d 1282, 1284 (Ind.App. 1998). "One study report[ed]" 50% of all husbands (and 33-40% of all wives) "admit to committing adultery" at some time in their marriages, another estimated 70% of all husbands and 50% of all wives cheat, while a third "conclude[d] that as many as 70% of spouses have been unfaithful." *Id. See Rosenthal v. Erven*, 17 P.3d 558, 561 (Or.App. 2001); *United States v. Lallemand*, 989 F.2d 936, 940 (7th Cir. 1993). *See also* Professor Eric

Anderson, *Five Myths About Cheating*, WASHINGTON POST, Feb. 13, 2012 at B9 (modern research confirms "cheating is as common as fidelity").

These facts explain why although 98% of Americans condemn adultery, they evidently do not believe the sin renders the sinner untrustworthy. Thus, not only have fourteen actual or suspected adulterers been elected to the Presidency (from Washington and Jefferson to Kennedy and Clinton), but also many recent ones (*e.g.*, FDR, JFK, LBJ, and Clinton) remain in high regard, long after their multiple affairs were uncovered.[20]

Significantly, cops are often sinners, too. "[T]he rate of infidelity among police officers is not that much different than in the general working populations." Dr. Laurence Miller, *Sex, Lies, and Police Work,* PoliceOne.Com (Oct. 10, 2006) (available10/27/13 at http://www.policeone.com/health-fitness/articles/1182709-Sex-lies-police-work/).[21]

---

[20]    "No fewer than 14 Presidents," or 32%, have been implicated in "marital infidelity," either before or during the Presidencies. Drummond Ayres, *14 Presidents Have Been the Talk of the Pillow*, N.Y. TIMES (Jan. 25 1998)(available10/23/13 at http://www.nytimes.com/1998/01/25/us/president-under-fire-history-14-presidents-have-been-talk-pillow.html.

[21]    *See* Miller, *Police families: Stresses, syndromes and solutions*, 35 AMERICAN J. FAMILY THERAPY 21 (2007); Laura Meckler, *Secret Service to Get a Closer Look: Obama, Lawmakers Expect Probe After Alleged Prostitution Scandal Involving Agents in Colombia*, WSJ ONLINE (April 16, 2012)(available10/15/13 at http://online.wsj.com/article/SB10001424052702304818404577346260235734298.html).

South Carolinians seem to be particularly forgiving of adulterous affairs (and prevarications about them), as evidenced by the recent political resurrection of former Governor Mark Sanford, who cheated on his wife, and the electorate, and repeatedly lied to both.

For all these reasons, a rational jury reasonably could decide their numerous adulterous friends and neighbors are no less credible than anyone else.

Significantly, while infidelity is relatively commonplace (and increasingly so), lying is absolutely universal (and has been for millennia). To be sure, the Ninth Commandment ordains, "You shall not give false testimony against your neighbor." EXODUS 20:16 (New Int'l Version 2011). Yet lying was ubiquitous in Biblical times, leading the Psalmist to lament: "Everyone lies to their neighbor." PSALM 12:2. Little seems changed since then except, perhaps, the recognition that many lies serve socially useful and emotionally healthy purposes.

> A growing body of research shows that people lie constantly, that deception is pervasive in everyday life. One study found that people tell two to three lies every 10 minutes, and even conservative estimates indicate that we all lie at least once a day. Such incessant prevarication might be a necessary social evil [because] "We use lies to grease the wheels of social discourse."

Ulrich Boser, *We're All Lying Liars*, U.S. NEWS (May 18, 2009)(emphasis added; available 10/23/13 at http://health.usnews.com/health-news/family-health/brain-and-behavior/articles/2009/05/18/were-all-lying-liars-why-people-tell-lies-and-

why-white-lies-can-be-ok). *See* Sissela Bok, LYING: MORAL CHOICE IN PUBLIC AND PRIVATE LIFE 58-72,78-81 (1978).[22]

All lies are not created equal and all do not carry the same opprobrium. Most are venial, not mortal sins. Philosophers (ranging from Aristotle and Kant to Hart and Rawls) and theologians (ranging from Augustine and Aquinas to Calvin and Bonhoeffer), long have stressed the distinction between the "malicious" lies (which injure others) and "officious," "white" lies (which are told to gain advantage and protect others). Bok, LYING at 57-122, 146-81, 203-41. *E.g.*, doctors prescribe placebos, husbands tell wives "you're not fat," tardy employees report "I'm stuck in traffic," and one lawyer may tell another "your brief is terrific." In fact, "we spin facts and make up fictions for all sorts of reasons, … to gain a raise … or to protect friends or a lover." Boser, *We're All Lying Liars, supra*.

White lies, not love, make the world go 'round.

White lies also save the world. As Churchill said: "'In war-time, truth is so precious that she should always be attended by a bodyguard of lies.'" (Quoted in Anthony Brown, BODYGUARD OF LIES: THE STORY BEHIND D-DAY, 10 (2007). Such prevarications remain standard fare in international relations. John Mearsheimer, WHY LEADERS LIE 21-44, 63-70 (2010). *See* Bok, LYING at 34-45.

---

[22]    *See also* Richard Chisholm, *"The Intent to Deceive,"* 74 J. OF PHILOSOPHY 143, 143-49 (1977); J.E. Adler, *Lying*, 94 J. OF PHILOSOPHY 435, 437-44 (1997); William Shakespeare, *Sonnet* 138 (1599).

And courts, including this one, commonly condone the officious "deception" and "deceit" law enforcement officers employ in the cause of justice. *See United States v. DeVore*, 423 F.2d 1069, 1070 (4th Cir. 1970)("police may utilize stealth and deception, so long as these strategies do not 'induce' an otherwise innocent person to commit a crime.")(citations omitted). *See United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009)("deceit ... do[es] not render a confession inadmissible."); *United States v. Mohammed*, 693 F.3d 192, 198 (D.C. Cir. 2012)(same). *See* Bok, LYING at 123-37.

In this light, it is difficult to believe hardened homicide detectives would imagine the tens of millions of Americans who cheat and the hundreds of millions who lie all are so uniquely depraved as to "lack[] credibility."

> **(c)    There is a genuine question of whether Justin "lacked credibility" because he opined he had enjoyed a "'perfect' marriage while engaging in an affair."**

Defendants asserted, and the District Court found Justin "lacked credibility" because he had expressed his opinion about "having a 'perfect' marriage [sic][23] while engaging in an affair." (JA772, citing JA43-44). "[A] reasonable jury could rationally" disagree. *Hoyle*, 650 F.3d at 334.

There are two reasons why Justin credibly could have rhapsodized about his marriage within two hours of his wife's murder. First, Justin truly may have

---

[23]    Holdorf reported Justin actually lamented that Nekia's murder had ruined their "perfect life," (JA456), not a perfect "marriage."

believed he and Nekia enjoyed a "'perfect' marriage" even though he had a girlfriend. Such beliefs are as common as not. "[A]mong individuals engaging in infidelity, 56% of men and 34% of women rate their marriage as 'happy' or 'very happy.'" Irene Tsapelas, *Infidelity*, in THE DARK SIDE OF CLOSE RELATIONSHIPS, 182 (2010; Cupach & Spitzberg, eds.). "[O]ne of the most tragic misconceptions about cheating is that people stray because they have fallen out of love" and are unhappy, but "research shows that young men … cheat simply because they desire sex with someone else." Anderson, *supra*.[24]

The second reason why Justin's belief he had a "perfect marriage" with Nekia was credible—and not inconsistent with mourning—has been well-understood by both ancient sages[25] and modern courts. *See California v. Younger*, 101 Cal.Rptr.2d 624, 637 (Cal. App. 2000)("people tend not to speak ill of

---

[24]   This has been known for decades. *See* Albert Ellis, *Healthy and disturbed reasons for having extramarital relations*, 16 J. OF HUMAN RELATIONS 490, 491 (1968); Julia Omarzu, *Motivations [for] extramarital relationships*, 24 INT'L J. OF SEXUAL HEALTH 154 (2012); Tsapelas, *supra* at 175-85; American Ass'n for Marriage & Family Therapy, *Infidelity* (available 10/23/13 at http://www.aamft.org/iMIS15/AAMFT/About/About_AAMFT/Content/About_A AMFT/About_AAMFT.aspx?hkey=a8d047de-5bf7-40cd-9551-d626e2490a25).

[25]   The aphorism, "Don't badmouth a dead man," is attributed to one of the "Seven Sages of Greece," Chilon of Sparta (circa 600 BC). *De mortuis nil nisi bonum*, WIKIPEDIA, (available 10/23/13 at http://en.wikipedia.org/wiki/De_mortuis_nil_nisi_bonum on 06032012). This Court often relies on WIKIPEDIA. *See Brown v. Nucor Corp.*, 576 F.3d 149, 156 (4th Cir. 2009); *Ordinola v. Hackman*, 478 F.3d 588, 593 n.4 (4th Cir. 2007).

deceased friends or family members.").[26] Ministers and psychologists agree survivors often develop an "idealized image" of the relationships they had with the dead, and frequently describe them precisely as Justin did: "'perfect.'" John Stephenson, DEATH, GRIEF, AND MOURNING, 156 (1985).[27]

From this perspective, Justin's "idealized image" of his marriage was—like his womanizing and furtiveness—hardly unusual and did not demonstrate he was a peculiar and immoral monster who "lacked credibility" but was just another flawed but fairly typical human being.

For all these reasons, the District Court erred in granting Defendants summary judgment on, and dismissing Justin's false-arrest claim.[28]

---

[26]    *See also Welch v. Workman*, 639 F.3d 980, 1011 (10th Cir. 2011); *Massachusetts v. Chambers*, 2013 Mass.LEXIS 465, 532 n.12 (Mass. 2013).

[27]    The death of a loved one, especially a sudden, violent, or tragic death, causes survivors to "elevate" their relationship with the departed to a "highly idealized place." Geraldine Humphrey, COUNSELING FOR GRIEF 26 (2d ed. 2007). *See* Warren Wiersbe, MINISTERING TO THE MOURNING 69-70 (2006); Charles Corr, DEATH AND DYING 258 (2012); Dr. Philip Culbertson, CARING FOR GOD'S PEOPLE 227 (2000).

[28]    Although the District Court correctly confined its analysis of probable cause to "the facts and circumstances known" at "the moment of Plaintiff's arrest," (JA779), Defendants may invite this Court to consider several post-arrest events they urged the District Court—unsuccessfully—to consider in the probable cause calculus, *e.g.*, a magistrate's issuance of a warrant to arrest Justin and a grand jury's indictment of him. (JA772-73).

Summary judgment is unwarranted even if this Court accepts the invitation the District Court spurned and thus considers those post-arrest events.

To be sure, as this Court recently reiterated—solely in the qualified immunity context—"decisions by intervening adjudicators have a significant impact on the question of whether an officer was objectively reasonable in his belief that

III.    **THE DISTRICT COURT ERRONEOUSLY GRANTED DEFENDANTS SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM THEY VIOLATED DUE PROCESS BY "FABRICATING" EVIDENCE**

Plaintiff's Complaint broadly asserted Defendants violated his Fourteenth Amendment rights and specifically alleged Defendants violated Due Process by "caus[ing] or coach[ing]" Joshua Porch—who testified for the prosecution at both of Justin's murder trials that he witnessed Justin stab Nekia—"to change and fabricate his false statements." (JA16-44).

The District Court initially—and correctly—characterized Justin's claim as a "due process argument that Defendants fabricated evidence." (JA776).[29] Then,

---

probable cause existed for an arrest." *Swick v. Wilde*, 2013 U.S.App.LEXIS 12481, *12 (4th Cir. June 19, 2013). Significantly, "[h]owever, this protective effect does not shield officers who have 'deliberately supplied misleading information that influenced the decision.'" *Id.* (quoting *Durham v. Horner*, 690 F.3d 183, 189 (4th Cir. 2012)). *See Evans v. Chalmers*, 703 F.3d 636, 647-48 (4th Cir. 2012)).

Here, as in *Swick*, summary judgment is unwarranted because a genuine dispute exists whether Defendants furnished "'misleading information that influenced,'" *id.* (emphasis added), the decisions to issue an arrest warrant and obtain an indictment. As discussed above, Defendants' "misleading information" included: (1) the supporting affidavit of "Holdorf" was not signed by him, sworn to by any RCSD officer, or notarized, (JA516, JA125-26); (2) false testimony that Justin "failed" a polygraph; and (3) failing to advise: (a) there was no evidence Nekia was alive when Justin he arrived home; (b) Justin could not have been party to the "domestic argument" that preceded his return home; (c) Nekia was entertaining a "black male" while Justin was away; and (d) Nekia's assailant was left-handed.

[29]    Justin's Complaint alleged "Defendants violated [his] right of Due Process" by "procur[ing], stat[ing], and/or provided inaccurate information for the purpose of prosecuting Justin." (JA17,¶49). The District Court acknowledged Justin "specifically contends that each Defendant knowingly fabricated evidence against him." (JA761, *see* JA768-JA770).

however, for reasons the court never explained, it embraced Defendants' amorphous argument, (JA49-50-n.12), that Justin's "due process"/fabrication" claim really was nothing but a duplicative "Fourth Amendment malicious prosecution claim" that Defendants lacked probable cause to arrest him. (JA769). Next, the court posited Justin could not "prevail on a Fourth Amendment malicious prosecution claim" unless he proved his arrest was not "supported by probable cause." (*Id.*). Ultimately, the court concluded that "because probable cause existed to arrest" Justin, Defendants were entitled to summary judgment on Justin's "malicious prosecution" claim, (JA779), *i.e.*, on a claim he never made.

The District Court's reasoning was sound—malicious prosecution claims fail if probable cause existed—but its premise was flawed: "fabrication" claims are ___*not*___ identical to "malicious prosecution" claims.

Clearly, although "malicious prosecution" claims are not cognizable under the Fourth Amendment, "fabrication" claims—like the one Justin actually made—are cognizable under the Due Process Clause and actionable under Section 1983. Indeed, this Court has "recognized that [a police] officer who violates" the Due Process "right not to be deprived of liberty" through the "use of evidence fabricated by or known to be false," is liable for damages under Section 1983. *White v. Wright*, 150 Fed.Appx. 193, 198 (4th Cir. 2005). *See Whitlock v.*

60

*Brueggemann*, 682 F.3d 567, 585 (7th Cir. 2012)("all courts … agree that the deliberate manufacture of false evidence contravenes the Due Process Clause.").

Hence, even if Defendants merited summary judgment on Justin's <u>Fourth Amendment/false-arrest</u> claim, Justin still would be entitled to pursue his independent <u>Fourteenth Amendment/Due Process/fabrication</u> claim.

For all these reasons, the District Court erred in granting Defendants summary judgment on, and dismissing Justin's fabrication-of-evidence claim.

## **CONCLUSION**

For the foregoing reasons, Plaintiff/Appellant urges this Court to reverse the District Court's decisions granting Defendants summary judgment and, furthermore, to remand with instructions that this case be stayed until Plaintiff/Appellant has had an adequate opportunity to complete discovery.

## **REQUEST FOR ORAL ARGUMENT**

Pursuant to Fed.R.App.P. 34 and Fourth Circuit Local Rule 34(a), Plaintiff/Appellant Justin Wright Mallory, Sr., by and through his undersigned counsel of record, respectfully requests that this Court grant oral argument in this matter due to the complexity of the factual and legal issues involved. Oral argument is especially warranted in this case because: (1) the dispositive set of issues presented have not recently been authoritatively decided; (2) the facts and legal arguments cannot be adequately presented in the briefs and record; (3) the

decisional process will be significantly aided by oral argument; and (4) the appeal is not frivolous.

Respectfully submitted on this 30th day of October, 2013.

/s/  J. Edward Bell, III
J. Edward Bell, III
BELL LEGAL GROUP
219 Ridge Street
Georgetown, SC  29440
(843) 546-2408

Jerry L. Finney
THE FINNEY LAW FIRM
2117 Park Street
Columbia, SC  29201
(803) 254-7408

*Counsel for Appellant*

## **CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
**Certificate of Compliance with Type-Volume Limitation,**
**Typeface Requirements, and Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>13,995</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.


<u>/s/  J. Edward Bell, III</u>
J. Edward Bell, III

*Counsel for Appellant*

Dated:  October 30, 2013

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on October 30, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Andrew F. Lindemann
> Robert D. Garfield
> DAVIDSON & LINDEMANN, PA
> 1611 Devonshire Drive
> Second Floor
> P. O. Box 8568
> Columbia, SC  29202
> (803) 806-8222
>
> *Counsel for Appellees*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

> /s/ Shelly N. Gannon
> Shelly N. Gannon
> GIBSON MOORE APPELLATE SERVICES, LLC
> 421 East Franklin Street
> Suite 230
> Richmond, VA  23219